HARRY L. MARRIOTT AND PATRICIA MARRIOTT, AND LESTER EARL SUTTON AND MARJORY R. SUTTON, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10218–77.     Filed March 20, 1980.

*Clinton A. Schroeder* and *John P. James,* for the petitioners.
*James C. Lanning,* for the respondent.

## OPINION

DRENNEN, *Judge:* Respondent determined the following income tax deficiencies against the petitioners:

| Petitioner | Year | Deficiency |
|---|---|---|
| Harry L. Marriott and | | |
| Patricia Marriott......................... | 1972 | $2,268.54 |
| | 1973 | 1,791.58 |
| Lester Earl Sutton and | | |
| Marjory R. Sutton ...................... | 1972 | 398.54 |
| | 1973 | 741.86 |

Because of concessions by both petitioners and respondent, the

only issue for our decision is whether petitioners may deduct partnership losses allocable to the periods during the taxable years prior to the time petitioners acquired the particular partnership interests, which losses were allocated in accordance with the partnership agreement. Because of petitioners' concessions and due to the dates on which petitioners purchased the respective partnership interests in issue, only the 1972 tax year is involved in the case of the Marriotts, and only the 1973 tax year is involved in the case of the Suttons.

The facts in this case were fully stipulated. The stipulation of facts, first supplemental stipulation of facts, stipulation of partial settlement, and attached exhibits are incorporated herein by reference. The facts necessary for an understanding of this case are as follows.

Petitioners Harry L. Marriott and Patricia Marriott, husband and wife, resided in Hopkins, Minn., at the time of the filing of their petition herein. They filed joint Federal income tax returns for 1972 and 1973. Petitioner Patricia Marriott is a party hereto solely by reason of having filed a joint return with her husband. Accordingly, reference will only be made to petitioner Harry L. Marriott (hereinafter Marriott).

Petitioners Lester Earl Sutton and Marjory R. Sutton, husband and wife, resided in Minnetonka, Minn., at the time of the filing of their petition herein. They filed joint Federal income tax returns for 1972 and 1973. Petitioner Marjory R. Sutton is a party hereto solely by reason of having filed a joint return with her husband. Accordingly, reference will only be made to petitioner Lester Earl Sutton (hereinafter Sutton). (Marriott and Sutton will sometimes hereinafter be referred to as petitioners.)

Metro Office Parks Co. (hereinafter Metro) is a Minnesota limited partnership formed on December 1, 1967. The general partners of Metro during 1972 and 1973 were John R. Neumeier and Metro Office Parks, Inc., a Minnesota corporation. There are 840 limited partnership units in Metro, each unit having a 1/840 interest in partnership capital, income, and loss. Metro keeps its books and prepares its tax returns on a calendar year and accrual method of accounting basis.

Metro constructed and operates an office complex in Bloomington, Minn. The office complex consists of seven office buildings, four underground parking garages, and one three-

story parking garage. The buildings were constructed one at a time between 1968 and 1974. One of the office buildings was sold on May 31, 1973.

On December 31, 1970, there were seven partners in Metro. Beginning in 1971, the ownership of Metro was broadened through (1) a public offering by Urban Land Investments, Inc., whereby it disposed of some of the 200 limited partnership units owned by it; (2) private placements by John R. Neumeier, whereby he disposed of some of the 200 limited partnership units owned by him; and (3) isolated sales of units by other partners. The offerings by both Urban Land Investments, Inc., and Neumeier were registered with the Securities Division of the Minnesota Department of Commerce.

At the end of 1971, there were 65 limited partners and assignees of limited partners, most of whom entered the partnership during 1971. With the caveat that some persons acquiring interests were technically assignees, not yet having been formally made limited partners, there were 79 limited partners on December 31, 1972, and 95 limited partners on December 31, 1973.

The following is a summary of the transactions in partnership units of Metro for the years 1971, 1972, and 1973: [1]

| Month | 1971 | 1972 | 1973 | 3-Year total number |
|---|---|---|---|---|
| January | 27 | 3 | 1 | 32 |
| February | 3 | 0 | 0 | 3 |
| March | 3 | 0 | 0 | 3 |
| April | 4 | 1 | 8 | 12 |
| May | 5 | 0 | 6 | 11 |
| June | 6 | 0 | 9 | 14 |
| July | 0 | 0 | 1 | 2 |
| August | 3 | 1 | 0 | 4 |
| September | 3 | 2 | 0 | 5 |
| October | 1 | 0 | 0 | 1 |
| November | 1 | 0 | 0 | 1 |
| December | 8 | 9 | 0 | 17 |
| Total | 64 | 16 | 25 | 105 |

[1]Since it in no way affects the decision reached herein, we will not correct the errors made in the stipulated figures contained in the "3-Year total number" column.

These transactions were transfers of partnership units by a partner to a third person who was not a partner on December 31, 1970.

Between 1971 and 1973, Sutton purchased three limited partnership units in Metro, one on September 10, 1971, one on January 2, 1972, and one on April 24, 1973. Only the losses allocated to the partnership unit purchased in April 1973 are at issue with regard to Sutton. He purchased that unit from an unidentified partner in Metro.

During December 1972, Marriott acquired five limited partnership units in Metro. He individually acquired two units on December 14, 1972, from Urban Land Investments, Inc. By this sale, Urban Land Investments, Inc., did not dispose of all of the units owned by it. On December 15, 1972, as one of a group of five individuals who purchased a total of 21[2] units under the name of Granite Group, Marriott acquired 3 limited partnership units. The Granite Group does not file a partnership income tax return.

Prior to December 30, 1971, Metro's partnership agreement, as amended, provided that at the end of each fiscal year the net profits or losses of the partnership's operation for that year "shall be divided among * * * the Partners and Assignees proportionately in the ratio which the number of Units owned by each of them bears to the number of units then owned by all of them." Such net profits and losses were to be divided among successive owners of any unit, based on the number of days each was the owner of the unit, without regard to the results of partnership operations during the period in which each was the owner of the unit and regardless of the date upon which distributions were made. Distributions of substantially all of the cash available from the operating income of the partnership were to be made annually and were to be allocated among the partners in the ratio of the number of units owned by them to the total number of units owned on the date of distribution. The term of the partnership was 30 years from the date it commenced, December 1, 1967. The agreement also provided for the assignment of partnership interests and admission of the

---

[2]This number cannot be reconciled with the number of unit transactions reflected in the preceding table. Both were stipulated. The discrepancy will not affect our conclusion.

assignees as substituted limited partners without termination of the partnership.

On December 30, 1971, the partnership agreement was amended to provide for allocation of net income and losses as follows:

The net income and net losses of the Partnership in any fiscal year ending after December 31, 1970, as determined for federal income tax purposes, whether ordinary or capital, shall be allocated among the Limited Partners and their assignees in proportion that the number of Limited Partnership units owned by each at the end of the fiscal year bears to 840 Limited Partnership Units (being the total number of Limited Partnership Units outstanding).

The amendment also provided that upon termination and dissolution of the partnership, after payment of all creditors and repayment of all working capital contributions of the limited partners, the limited partners should share in the partnership assets in the proportions in which profits and losses were allocated as above.

Neither Marriott nor Sutton was involved in determining the profits-and-losses allocation for Metro.

Pursuant to the partnership agreement as amended on December 30, 1971, the full amounts of partnership losses for 1972 and 1973 were allocated to the capital accounts of the partners as of the end of each year. There were minor differences between the tax losses and the book losses, with the latter being allocated to the capital accounts, but those differences were not connected with the allocation. There were no distributions made to the limited partners in either 1972 or 1973.

Pursuant to the partnership agreement, the entire loss allocable to the five units owned by Marriott on December 31, 1972, was allocated to Marriott on Metro's 1972 partnership return and reported by Marriott on the 1972 joint return he filed with his wife. Similarly, the entire 1973 loss allocable to the three units owned by Sutton on December 31, 1973, was allocated to Sutton on Metro's 1973 partnership return and reported by Sutton on the 1973 joint return he filed with his wife.

In the statutory notices of deficiency, respondent determined that petitioners were not entitled to deduct that portion of the partnership losses allocable to the portion of the year prior to the time petitioners purchased the partnership interests. Thus, in the case of Marriott, a deduction was disallowed for that portion

of the losses allocable to Marriott's five partnership units under the partnership agreement for the period prior to Marriott's purchase of the units in December 1972. Similarly, in the case of Sutton, a deduction was disallowed for the portion of the losses allocable to the partnership unit purchased by Sutton prior to the time he purchased the unit on April 24, 1973.[3]

The issue for decision is whether petitioners may deduct the portion of the partnership losses allocable to their respective partnership units for the periods during the taxable years prior to the time petitioners acquired the partnership units.

Respondent advances two arguments in support of his determination that petitioners may not deduct losses which are allocable to the periods of time during the partnership's taxable years prior to the petitioners' acquisition of their respective partnership interests. The first argument, which parallels the assignment-of-income principle, is that a taxpayer may not deduct a loss which he did not sustain. Since a part of the partnership losses should be allocated to the part of the year prior to petitioners' entry into the partnership, they are not entitled to deduct those losses. Respondent's second argument is that because section 706(c)(2)(B), I.R.C. 1954,[4] requires the partners from whom petitioners purchased the partnership units to determine their distributive share of losses by taking into account their varying partnership interests during the taxable year, so must petitioners.

In support of the allocation of the partnership's losses in accordance with the partnership agreement, petitioners argue: (A) section 706 cannot be interpreted to contravene section 704(a) when subchapter K is read as a whole; (B) section 704(a) requires an allocation of the losses in accordance with the partnership agreement unless a contrary result is required by another provision of section 704; (C) section 704(b)(2), the only provision which could possibly negate the application of section 704(a), is not applicable because the partnership's profit and loss allocation provision was adopted for business purposes (to simplify the allocation process because of the number of limited

---

[3]Respondent's allocation was based on the number of days during the taxable year that petitioners owned the units. Respondent, in effect, utilized the allocation method contained in Metro's partnership agreement prior to its amendment on Dec. 30, 1971.

[4]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years 1972 and 1973, unless otherwise noted.

partners and the number of transactions involving limited partnership units) and not for tax avoidance purposes; and (D) the assignment-of-income doctrine is inapplicable.

The issue involved is one that has caused considerable uncertainty since subchapter K was first enacted in the 1954 Code because the literal application of sections 704(a) and 706(c)(2)(B) may produce inconsistent results where the provisions in the partnership agreement for allocation of profits and losses may differ from the provisions of section 706(c)(2)(A) and (B). The problem has been referred to as the retroactive allocation of partnership losses,[5] although, for reasons hereinafter stated, we do not find that to be a very apt description of what occurred here.

Partners are required by section 702(a) to report their "distributive share[s]" of the partnership's taxable income or loss.[6] Section 704(a) provides that a "partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement."[7] Section 761(c) defines the term "partnership agreement" as including any modifications made to the agreement prior to the time prescribed by law for filing the partnership return. Partners do not have unbridled discretion, however, in providing in the partnership agreement for the determination of partners' distributive shares of items of income, gain, loss, etc. See sec. 704(b)(2).[8]

---

[5]See 1 A. Willis, Partnership Taxation, ch. 24 (2d ed. 1976).

[6]Sec. 702(a) provides in pertinent part:

GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

* * * * * * *

(9) taxable income or loss * * *

[7]Sec. 704(a) was amended by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 213(c)(2), 90 Stat. 1548, by deleting the word "section" and inserting therefor the word "chapter" for partnership taxable years beginning after Dec. 31, 1975. The amendment was designed to provide that the partnership agreement would be "overridden by any contrary provisions of the partnership provisions (under subchapter K, including section 706(c)(2)(B))." S. Rept. 94–938, p. 98 (1976), 1976–3 C.B. (Vol. 3) 49, 136. It was not intended, however, "that any inference be drawn as to the propriety or impropriety of a retroactive allocation under present law." S. Rept. 94–938, supra.

[8]Sec. 704(b) provides:

(b) * * * A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

Section 706(c)(1) provides generally that the taxable year of a partnership shall not close as a result of the death of a partner, entry of a new partner, or liquidation or sale or exchange of a partner's interest, except if the partnership terminates or except as provided in paragraph (2) of the subsection.

Section 706(c)(2)[9] provides for certain tax consequences to partners whose partnership interests change during the partnership's taxable year:

(2) PARTNER WHO RETIRES OR SELLS INTEREST IN PARTNERSHIP.—

(A) DISPOSTION OF ENTIRE INTEREST.—The taxable year of a partnership shall close—

(i) with respect to a partner who sells or exchanges his entire interest in a partnership, and

(ii) with respect to a partner whose interest is liquidated, except that the taxable year of a partnership with respect to a partner who dies shall not close prior to the end of the partnership's taxable year.

Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary or his delegate, for the period ending with such sale, exchange, or liquidation.

(B) DISPOSITION OF LESS THAN ENTIRE INTEREST.—The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced, but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interests in the partnership during the taxable year.

Section 1.706–1(c)(2)(ii), Income Tax Regs., provides that "the partner shall include in his taxable income for his taxable year within or with which his membership in the partnership ends, his distributive share of items described in section 702(a)." With respect to the computation of his distributive share, the regulations go on to provide:

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

Respondent has not argued that sec. 704(b)(2) is applicable to this case. See *Holladay v. Commissioner*, 72 T.C. 571, 587 (1979), in which respondent conceded that sec. 704(b)(2) has no application to sec. 702(a)(9) "bottom line" losses. See also *Boynton v. Commissioner*, 72 T.C. 1147 (1979), on appeal (5th Cir., Jan. 21, 1980).

[9] Sec. 706(c)(2)(B) was amended by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 213(c)(1), 90 Stat. 1547–1548, by striking out "or with respect to a partner whose interest is reduced" and inserting in lieu thereof "or with respect to a partner whose interest is reduced (whether by entry of a new partner, partial liquidation of a partner's interest, gift, or otherwise)." The amendment was effective for partnership taxable years beginning after Dec. 31, 1975.

In order to avoid an interim closing of the partnership books, such partner's distributive share of items described in section 702(a) may, by agreement among the partners, be estimated by taking his pro rata part of the amount of such items he would have included in his taxable income had he remained a partner until the end of the partnership taxable year. The proration may be based on the portion of the taxable year that has elapsed prior to the sale, exchange, or liquidation, or may be determined under any other method that is reasonable. * * *

The regulations go on to deal with the tax consequences of the transferee by declaring:

Any partner who is the transferee of such partner's interest shall include in his taxable income, as his distributive share of items described in section 702(a) with respect to the acquired interest, the pro rata part (determined by the method used by the transferor partner) of the amount of such items he would have included had he been a partner from the beginning of the taxable year of the partnership. * * *

Since this case was submitted, several cases have been considered by this Court involving this issue, notably *Moore v. Commissioner*, 70 T.C. 1024 (1978) (Court reviewed); *Holladay v. Commissioner*, 72 T.C. 571 (1979) (Court reviewed); and *Boynton v. Commissioner*, 72 T.C. 1147 (1979), on appeal (5th Cir., Jan. 21, 1980). In each of these cases, this Court disallowed deductions of partnership losses to the taxpayer-partner in excess of his economic interest in the partnership as a whole, although for somewhat different reasons.

In *Holladay*, where the taxpayer-partner was entitled to about a 50-percent division of the economic benefits of a joint venture but was allocated 100 percent of the joint venture losses for the first 5 years by the joint venture agreement, we limited the taxpayer's deduction to 50 percent of the joint venture losses because we concluded that the provision in the agreement with reference to losses was for tax avoidance purposes only and was not a genuine adjustment of the partner's distributive share. We stated that for allocations of partnership income or loss to be bona fide for Federal tax purposes, the allocations must accurately reflect the economic basis upon which the partners have agreed to share the profits and losses.

In *Boynton*, a taxpayer entered into a partnership agreement with another individual, which provided that the profits and losses of the partnership were to be divided equally between the two partners for determining their share of distributions, but by amendment, adopted October 30, 100 percent of the losses were

to be allocated to the taxpayer as his distributive share for tax purposes. This Court again limited the taxpayer-partner's loss deduction to 50 percent of the partnership losses stating that the power of partners to fix their overall distributive shares was limited by the requirement that the allocation be bona fide in the sense that it is genuinely in accord with the actual division of profits and losses inter sese which the partners in fact agreed upon.

In neither of the above cases did respondent rely on section 704(b)(2) but the Court nevertheless struck down the artifical special allocation of losses which were obviously adopted for tax purposes only. Since there were no transfers of partnership interest during the years before the Court, section 706 was not involved.

However, in *Moore* there were transfers of partnership interests in the year before the Court, as there were in this case, and this Court, in a Court-reviewed opinion, held that under section 706 even where there was a transfer of only a partial partnership interest the partnership losses for the year attributable to the interests transferred had to be prorated between the transferor of the partial interest and the transferee thereof as of the date of transfer. The majority opinion also concluded that this was confirmed by the assignment-of-income doctrine. In reaching its conclusion, this Court relied on *Rodman v. Commissioner*, 542 F.2d 845 (2d Cir. 1976), revg. on this issue T.C.Memo. 1973–277, which also involved the allocation of partnership profits and losses where there had been a transfer of partial partnership interests during the relevant year. The Court of Appeals found that the retroactive reallocation of partnership profits and losses occasioned by the transfers late in the taxable year violated the prohibition against one taxpayer assigning taxable income to another. The Court also found support for its conclusion in section 706(c)(2), stating that since, under section 706(c)(2)(B), the sellers must take into account their varying interests in the partnership during the taxable years, it was only logical that the buyer must do the same.

This Court recognizes that the facts and circumstances in this case differ materially from those in *Moore* and the other cases mentioned above. Here, the provision that the partnership profits and losses were to be divided on a pro rata basis among the owners of the 840 partnership units as of the end of the

partnership year was adopted prior to the years before the Court, and the transfers of partnership interests in these years did not effect a retroactive redivision of the partnership profits and losses different from that provided in the agreement as amended. There was no special allocation of a particular item of partnership income or losses. The provision in the agreement for division of profits and losses among the owners of the units as of the end of the year was in accord, so far as we know, with the actual economic interests of the partners in the partnership. But these factual distinctions notwithstanding, this Court finds that this case is controlled by the rationale of its opinion in *Moore* and that respondent must be sustained in prorating the partnership losses between the transferor and the transferee as of the dates of the transfers.

In *Moore*, noting that again respondent decided not to rely on section 704(b)(2), the majority opinion concluded that:

When there is a transfer of a partial partnership interest, section 706(c)(2)(B) requires the transferor to report his distributive share of partnership items for the period before the transfer, requires the transferor and transferee to report their distributive shares of partnership items for the period after the transfer, and prohibits the retroactive shifting of such interests.[10] [70 T.C. at 1032.]

While, as above noted, there may have been no retroactive shifting of distributive shares in a strict sense, the transfers and the provisions of the partnership agreement did result in allocating to the petitioners herein losses that were incurred prior to the date they acquired their partnership units.

*Moore* stands for the proposition that where there is a transfer of partnership interests during a taxable year, section 706(c)(2) supersedes section 704(a) and requires that the profits and losses of a partnership must be allocated for tax purposes between the transferor of the interest and the transferees thereof for the period before the transfer and the period after the transfer, respectively, and that any reasonable method of making the allocation is acceptable. Since petitioner has not objected to respondent's method of allocation if an allocation must be made, and in fact it coincides with the method provided in the

---

[10]While it is apparent that some of the transfers here involved were of partial interests only, it cannot be determined from the stipulated facts whether any of them were transfers of entire partnership interests.

partnership agreement prior to the amendment of December 30, 1971, we approve it.

This Court has reconsidered its opinion in *Moore v. Commissioner, supra,* and reaffirms it.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, *J.,* concurring: While I agree with the result reached by the majority, I find troubling the implications of language in the opinion such as "while * * * there may have been no retroactive shifting of distributive shares in a strict sense," and "The provision in the agreement for division of profits and losses among the owners of the units as of the end of the year was in accord, so far as we know, with the actual economic interest of the partners in the partnership."

It seems quite apparent that there was indeed a retroactive shifting of distributive shares. The effect of the December 30, 1971, amendment to the partnership agreement was to provide an automatic retroactive allocation to any limited partner admitted after the first day of any given partnership year. That is precisely what petitioners sought to achieve here.

Furthermore, I find nothing in the findings of fact to support the assertion that the amendment comports with the economic interests of the partners. Why, for example, would any intelligent person buy into a partnership at the end of a year only to be saddled with a full year's operating losses—except to obtain tax deductions?

I find it puzzling indeed that the majority, while ostensibly following *Moore v. Commissioner,* 70 T.C. 1024 (1978), makes the statement that "the transfers of partnership interests in these years did not effect a retroactive redivision of the partnership profits and losses different from that provided in the agreement as amended." As one might have assumed from *Moore,* the fact that the partnership agreement did, indeed, provide for retroactive allocations is irrelevant; rather, the mischief lies in the fact of the retroactive allocations themselves. It is also immaterial, though the majority opinion implies the contrary, that the partnership agreement was amended in a year prior to those

before the Court, rather than during or subsequent to those years; the problem remains the same.

I would further reiterate that, as we demonstrated in *Moore*, the conceptual basis for the disallowance of retroactive allocations where new partners are admitted is the overlay of the assignment-of-income doctrine upon the mechanical contrivance here again postulated by the petitioners. Prior to the Second Circuit's decision in *Rodman v. Commissioner*, 542 F.2d 845 (2d Cir. 1976), revg. on this issue T.C. Memo. 1973–277, and our decision in *Moore*, it had been argued, as petitioners argue, that sections 702(a), 704(a), and 761(c) reveal a legislative purpose to allow partners flexibility in determining inter se the incidents of their tax liability resulting from participation in a partnership; e.g., to allow retroactive allocations of losses to incoming partners. *Moore v. Commissioner, supra* at 1030. In *Moore*, we quoted the Supreme Court speaking in *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440–441, as follows:

the taxpayer who sustained the loss is the one to whom the deduction shall be allowed. Had there been a purpose to depart from the general policy in that regard, and to make the right to the deduction transferable or available to others than the taxpayer who sustained the loss, it is but reasonable to believe that purpose would have been clearly expressed. And as the section contains nothing which even approaches such an expression, it must be taken as not intended to make such a departure.

As we said in *Moore v. Commissioner, supra* at 1034, "the same observations are pertinent in the case before us. Subchapter K contains no clear expression of the intention to permit a partner to deduct losses which accrued prior to his entry into the partnership." In my judgment, we should take no step now which would in any way give the impression that we have receded from that position.

DAWSON, SIMPSON, WILES, and CHABOT, *JJ.*, agree with this concurring opinion.