CECIL R. RICHARDSON AND DORIS C. RICHARDSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5808–78, 12362–79, 12363–79.     Filed April 1, 1981.

[1]Cases of the following petitioners are consolidated herewith: George Schneider, Jr., and Marianne Schneider, docket No. 12362–79; and Irwin J. Rice and Martha J. Rice, docket No. 12363–79.

*D. Irvin Couvillion,* for the petitioners.
*William A. Neilson,* for the respondent.

STERRETT, *Judge*: By statutory notices dated March 29, 1978 (docket No. 5808–78), and June 18, 1979 (docket Nos. 12362–79 and 12363–79), respondent determined deficiencies in petitioners' income taxes for the taxable years ended December 31, 1974, and December 31, 1976, as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 5808–78 | Cecil R. Richardson and Doris C. Richardson | 1974 | $5,120.16 |
| 12362–79 | George Schneider, Jr., and Marianne Schneider | 1974 | 9,390.00 |
| | | 1976 | 762.00 |
| 12363–79 | Irwin J. Rice and Martha J. Rice | 1974 | 11,402.00 |

By an amendment to answer, filed after trial, respondent seeks an additional deficiency against Cecil R. and Doris C. Richardson for the year 1974 in the amount of $9,688.75, or a total deficiency of $14,808.91. The cases have been consolidated for the purposes of trial, briefing, and opinion.

The issues for our decision are as follows: (1) Whether the admission of new partners into Bengal I, Bengal II, and Batture on December 31, 1974, with the allocation to the new partners of 99 percent of the losses for all of 1974, contravenes section 706(c)(2)(B), I.R.C. 1954, as it existed prior to 1976; (2) if section 706(c)(2)(B) does apply to prohibit the retroactive reallocation to the new partners of 99 percent of the losses for all of 1974, whether the respondent's reallocation to the new partners of $\frac{1}{365}$ of the total losses for 1974 from each partnership is proper; (3) whether the old partners' bases in the partnerships must be determined on the last day of the partnerships' taxable year for purposes of determining the amount of losses as limited by section 704(d); (4) whether petitioner Richardson may increase his basis in an amount equal to his proportionate share of partnership liabilities that were not assumed by new partners, thereby reducing his gain realized under section 731; (5) whether the petitioner Richardson received in 1974, and failed to report on his joint income tax return for that year, various noncompetition fees and management fees from Bengal I, Bengal II, and

Batture; and (6) whether petitioner Richardson is entitled to an award of attorney's fees.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

Petitioners Cecil R. Richardson and Doris C. Richardson, husband and wife, resided in Baton Rouge, La., at the time of the filing of their petition herein. They timely filed a joint Federal income tax return for the calendar year 1974. Petitioner Doris C. Richardson is a party hereto solely by reason of having filed a joint return with her husband. Accordingly, reference will be made only to petitioner Cecil R. Richardson.

Petitioners George Schneider, Jr., and Marianne Schneider, husband and wife, resided in Lafayette, La., at the time of the filing of the petition herein. They timely filed joint Federal income tax returns for the calendar years 1974 and 1976. Petitioner Marianne Schneider is a party hereto solely by reason of having filed a joint return with her husband. Accordingly, reference will be made only to petitioner George Schneider.

Petitioners Irwin J. Rice and Martha J. Rice, husband and wife, resided in Shreveport, La., at the time of the filing of their petition herein. They timely filed a joint Federal income tax return for the calendar year 1974. Petitioner Martha Rice is a party hereto solely by reason of having filed a joint return with her husband. Accordingly, reference will be made only to petitioner Irwin J. Rice. Messrs. Richardson, Schneider, and Rice hereinafter sometimes will be referred to as petitioners.

During the years 1974, 1975, and 1976, petitioners were partners in three partnerships which owned and operated apartment projects in Baton Rouge, La., catering primarily to students of Louisiana State University. The partnerships were known as Batture Apartments (Batture), Bengal Towers I Apartments (Bengal I), and Bengal Towers II Apartments (Bengal II). Petitioner Richardson was a general partner in all three partnerships for the entire years 1974 and 1975 and remained a partner until May 20, 1976, when his interests were sold. Petitioners Schneider and Rice were admitted into each partnership on December 31, 1974, as partners in commendam under Louisiana law (equivalent to status as limited partners for

Federal tax purposes) and remained partners throughout 1975 and 1976.

Batture originated as a general partnership on February 1, 1972, and had four general partners, each owning a one-fourth interest in capital, profits, and losses. The partnership agreement was evidenced in writing and was duly recorded in the public records. Bengal I originated as a general partnership in early 1972 and had two general partners, each owning a one-half interest in capital, profits, and losses. The agreement for this partnership was not evidenced in writing. Bengal II originated as a general partnership on February 27, 1973, and had three general partners, each owning a one-third interest in capital, profits, and losses. The partnership agreement was evidenced in writing and was duly recorded in the public records.

The apartment projects that were owned by each of the partnerships were constructed by petitioner Richardson and Daniel R. Fazekas, general partners, who were in the construction business. The principal debts of each partnership, evidenced by mortgages encumbering the property of each, were as follows:

*Batture*:

First Mortgage, dated Dec. 28, 1972, in favor of Carruth Mortgage Corp. in the amount of $550,000.

Chattel Mortgage dated Apr. 24, 1973, in favor of Capital Bank & Trust Co. of Baton Rouge, La., in the amount of $113,594.40;

*Bengal I*:

First Mortgage, dated Dec. 20, 1972, in favor of Capital Bank & Trust Co. of Baton Rouge, La., in the amount of $490,000; the note was assigned to Carruth Mortgage Corp.

Second Mortgage, dated Jan. 30, 1974, in favor of Carruth Mortgage Corp. in the amount of $16,209.48;

*Bengal II*:

First Mortgage, dated Mar. 20, 1973, in favor of Louisiana National Bank of Baton Rouge, La., in the amount of $600,000; the note was assigned to Carruth Mortgage Corp.

Second Mortgage, dated Jan. 30, 1974, in favor of Carruth Mortgage Corp., in the amount of $50,308.44.

The above amounts represent the balances as they stood at the origination of each loan and not the amount of indebtedness as of December 31, 1974.

In addition to the mortgage encumbrances set forth above, the partnerships during the year 1974 were also indebted as follows:

*Batture*:

| | |
|---|---|
| $12,000 | Raceland State Bank, Raceland, La. |
| 3,000 | Capital Bank & Trust Co., Baton Rouge, La. |
| 15,000 | |

*Bengal I*:

| | |
|---|---|
| $7,500.00 | Capital Bank & Trust Co., Baton Rouge, La. |
| 5,000.00 | Fidelity National Bank of Baton Rouge, La. |
| 5,000.00 | B & D Electric Co. |
| 40,110.60 | Plaquemine Bank & Trust Co., Plaquemine, La., assignee from Red Stick Contract & Supply, Inc., as per three contracts of assignment |
| 57,610.60 | |

*Bengal II*:

| | |
|---|---|
| $4,500 | Fidelity National Bank, Baton Rouge, La. |
| 1,680 | Capital Bank & Trust Co., Baton Rouge, La. |
| 20,000 | Louisiana National Bank of Baton Rouge, La. |
| 5,000 | B & D Electric Co. |
| 39,624 | Plaquemine Bank & Trust Co., assignee from Red Stick Contract & Supply, Inc., as per two contracts of assignment |
| 70,804 | |

With respect to the $15,000 owed by Batture; the $7,500 to Capital Bank & Trust Co. and the $5,000 to Fidelity National Bank of Baton Rouge owed by Bengal I; and the $4,500 to Fidelity National and the $1,680 to Capital Bank & Trust Co. owed by Bengal II, there is no evidence identifying the date upon which the listed indebtednesses were outstanding by the partnerships in the amounts cited. With respect to the $40,110.60 and the $39,624 due and owing to Plaquemine Bank & Trust Co. by Bengal I and Bengal II, respectively, these amounts represent the balances due on June 3, 1974. There is no record to identify the outstanding balances of these indebtednesses as of December 31, 1974. With respect to the $20,000 of indebtedness to Louisiana National Bank of Baton Rouge by Bengal II, this amount represents the original principal of the indebtedness. The balance outstanding as of December 31, 1974, was $13,680.

Each of the partnerships experienced difficulty in generating sufficient cash to make timely the monthly mortgage payments and otherwise pay the ordinary and necessary expenses of operation. The financial problems of the projects became acute in 1974 when Carruth Mortgage Corp., as mortgagee and as

servicing agent on the first and second mortgages on each apartment complex, experienced difficulty in timely collecting the monthly payments. Due to numerous instances of late payments and partial payments, Carruth enforced collection of late charges and in certain instances waived such late charges as a matter of expediency. During the latter part of 1974, the mortgage corporation considered declaring all three projects in default and instituting foreclosure proceedings. The three partnerships also experienced difficulties in paying other creditors, including Capital Bank & Trust Co. and the utility company providing electric service to the projects.

Due to the financial difficulties encountered, the partners had extended themselves to their limits in borrowing from outside sources to finance the deficits incurred by the projects. They were unwilling to provide any additional capital to put the projects on sound financial footing. As a result, in 1974, they began to seek purchasers for the partnerships. Sometime during 1974, petitioner Richardson approached Jack N. Dyer, Jr., for the purpose of negotiating with respect to the three projects in order to alleviate the projects of their financial difficulties. Mr. Dyer was a developer, builder, and manager of several apartment complexes in Baton Rouge, La., including one project across the street from the Batture Apartments known as Fountainhead Apartments. Since September 1969, Mr. Dyer, with other investors, had sought distressed, dilapidated, ill-managed, and ill-repaired property. He would bring in additional capital, would repair and market the property, and hopefully get the property back "on track."

After several months of negotiations between the partners and Mr. Dyer, an agreement was reached with respect to each project. The agreement essentially was as follows:

(a) Mr. Dyer would be admitted into each partnership as a general partner and would assume the management and operation of each project;

(b) the existing partners would remain as general partners but would not be called upon to make any further contributions in the future;

(c) each partnership would be converted into a partnership in commendam under Louisiana law (a limited partnership for tax purposes), and limited partners would be admitted for a 75-percent capital interest; and

(d) the new limited partners would contribute cash and notes for the purpose of paying outstanding bills due by each partnership, bringing the mortgage payments current and providing extra capital for future needs of the apartment projects.

The agreement worked out with Mr. Dyer was subject to additional conditions, some of which were:

(a) The outstanding bills to be paid by the capital contributions of the new partners were itemized and identified,

(b) Certain loans owing to some of the partners would be paid,

(c) A management fee would be paid the old partners for their services in managing the projects for the year 1974,

(d) The old partners were to agree, by separate contract, not to compete in the apartment business within a designated area for a period of two years, 1975 and 1976,

(e) Mr. Arango and Mr. Rooks, original partners, were to be paid $7,500 for business advice fees rendered to Batture Apartments during 1974,

(f) Dyer was to be paid his management fees, in advance, for managing the projects during 1975,

(g) A total of $50,000 in debts owing on the three projects would remain the full responsibility of the old partners and would not be taken over by the new partnerships,

(h) An amended partnership information return would be filed by Batture Apartments with the Internal Revenue Service to increase the depreciable life of certain of the partnership's assets for the years 1972 and 1973.

With respect to (g), above, we accept the testimony of Richardson, which was corroborated by Dyer, that the $50,000 amount represents the outstanding indebtedness retained by the old partners upon the admission of the new partners.

The negotiations with Dyer resulted in execution of three agreements on December 30, 1974, written articles of partnership in commendam dated December 31, 1974, and noncompetition agreements. Several individuals were admitted into each partnership as partners in commendam, together owning a 75-percent interest in each partnership; Dyer was admitted as a general partner.

As a result of the agreements entered into, the following individuals owned the partnership interests in Bengal I, Bengal II, and Batture before and on December 31, 1974:

BENGAL I

| Partner | Ownership prior to 12/31/74 | Ownership on 12/31/74 |
|---|---|---|
| Richardson | 50% | 1% General partner |
| Fazekas | 50% | 1% General partner |
| Dyer | None | 23% General partner |
| Schneider | None | 5% Limited partner |
| Howard | None | 50% Limited partner |
| O'Connor | None | 5% Limited partner |

| | | | |
|---|---|---|---|
| Rice | None | 5% | Limited partner |
| Jackson | None | 10% | Limited partner |
| Total | 100% | 100% | |

### BENGAL II

| Partner | Ownership prior to 12/31/74 | Ownership on 12/31/74 | |
|---|---|---|---|
| Richardson | 33⅓% | 1% | General partner |
| Fazekas | 33⅓% | 1% | General partner |
| Russell | 33⅓% | 1% | General partner |
| Dyer | None | 22% | General partner |
| Schneider | None | 5% | Limited partner |
| Howard | None | 50% | Limited partner |
| O'Connor | None | 5% | Limited partner |
| Rice | None | 5% | Limited partner |
| Jackson | None | 10% | Limited partner |
| Total | 100% | 100% | |

### BATTURE

| Partner | Ownership prior to 12/31/74 | Ownership on 12/31/74 | |
|---|---|---|---|
| Richardson | 25% | 1% | General partner |
| Fazekas | 25% | 1% | General partner |
| Rooks | 25% | 1% | General partner |
| Arango | 25% | 1% | General partner |
| Dyer | None | [2] 21% | General partner |
| Schneider | None | 5% | Limited partner |
| Howard | None | 50% | Limited partner |
| O'Connor | None | 5% | Limited partner |
| Rice | None | 5% | Limited partner |
| Jackson | None | 10% | Limited partner |
| Total | 100% | 100% | |

The limited partners entering the partnerships on December 31, 1974, were required to buy at least one "unit" in each partnership. A unit in each partnership represented a 5-percent interest in the partnership. A unit cost $4,027 in Bengal I, $5,131.53 in Bengal II, and $4,205.60 in Batture. Therefore, the following contributions were made by the partners in commendam admitted into each partnership on December 31, 1974:

---

[2] In his proposed findings of fact in the original brief, respondent refers to Dyer as a limited partner with an interest of 21 percent. Petitioners do not specifically object to that proposed finding. However, other exhibits and other proposed findings of fact label Dyer a general partner. Our examination of the exhibits supports the latter finding, and we assume the reference to Dyer as a limited partner was an inadvertent error.

Bengal I..................$60,406.00 (cash and promissory notes)
Bengal II ................ 76,972.90 (cash and promissory notes)
Batture .................. 63,084.00 (cash and promissory notes)
    Total.................200,461.90

Of the above capital contributions, the following amounts constituted cash which was paid to each partnership on December 31, 1974:

Bengal I ......................................$34,405
Bengal II .....................................35,483
Batture.......................................47,084
    Total ....................................116,972

Dyer contributed $100 cash to each of the partnerships for his respective interests therein. The contracts also provided that on February 1, 1976, after return of partnership capital in the amount of $100, each of the original general partners would be dismissed completely from their respective partnerships.

The agreement with respect to the admission of the partners in commendam provided that the profits and losses would be allocated to such new partners in the following ratios for the following years: 99 percent for the years 1974, 1975, and 1976; 75 percent for the years 1977 and 1978; 50 percent for all years thereafter.

On December 31, 1974, in accordance with the agreements made between the original partners and Dyer, the following payments were made by each partnership:

|  | Total paid | Deductible expense | Capital expenditure |
|---|---|---|---|
| Batture............................ | $49,668.67 | $41,940.97 | $7,827.70 |
| Bengal I.......................... | 33,766.51 | 33,766.51 | --- |
| Bengal II......................... | 35,315.12 | 35,315.12 | --- |

All the expenses labeled "deductible expenses" were ordinary and necessary business expenses of the partnerships, which expenses were incurred prior to and on December 31, 1974.

Petitioner Richardson received on December 31, 1974, noncompetition fees and management fees from Bengal I, Bengal II, and Batture totaling $22,096.49. This amount was not reported as income by petitioner Richardson on his 1974 joint income tax return. The statutory notice of deficiency for the year 1974 sent to petitioner Richardson on March 29, 1978, did not propose an adjustment for these unreported fees.

## OPINION

The primary issue presented is whether section 706(c)(2)(B) was applicable to the admission of new partners prior to 1976. The focus of the inquiry is on the propriety of allocating 99 percent of the partnerships' profits and losses for the entire taxable year to the newly admitted limited partners.

Petitioners contend that the disproportionate allocation of profits and losses for the entire year 1974 to the new partners should be sustained because sections 704 and 761 permit such an allocation if it has substantial economic effect and lacks any tax-avoidance motive. Respondent, relying on *Moore v. Commissioner*, 70 T.C. 1024 (1978), and *Marriott v. Commissioner*, 73 T.C. 1129 (1980), contends that section 706(c)(2)(B) supersedes section 704(a) and requires that the partnerships' profits and losses, for tax purposes, must be allocated between the old partners and the new partners for the period before the admission of the new partners. Respondent further contends that the only reasonable method of allocation is either: (1) To permit a deduction for the percentage of the tax year the new partners were members of the partnerships ($\frac{1}{365}$ in the instant case), or (2) to allow the new partners a deduction only for those partnership expenses actually *incurred* and paid on December 31, 1974.

Section 702(a) requires a partner to report his "distributive share" of the partnership's taxable income, gains, losses, deductions, or credits.[3] Section 704(a) provides that a partner's distributive share of such items is to be determined by the "partnership agreement." A partnership agreement includes any modifications made to the agreement prior to the time prescribed by law for filing the partnership return. Sec. 761(c). However, section 704(b)(2) provides that if the principal purpose of the allocation with respect to the partner's distributive share of any item is the avoidance or evasion of any tax, then, the partnership agreement will not control. In lieu thereof, a

---

[3]Sec. 702(a) provides in pertinent part:

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

\*      \*      \*      \*      \*      \*      \*

(8) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary or his delegate, and

(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

partner's distributive share of various tax attributes is determined in accordance with his share of income or losses.[4]

Section 706(c)(1) provides that the taxable year of a partnership shall not close as a result of the death of a partner, entry of a new partner, liquidation of a partner's interest, or sale or exchange of a partner's interest in the partnership. Section 706(c)(2), however, provides an express exception to the rule of section 706(c)(1). Section 706(c)(2) provides for certain tax consequences to a partner whose partnership interest changes during the partnership's taxable year. In part, it provides:

(2) PARTNER WHO RETIRES OR SELLS INTEREST IN PARTNERSHIP.—

\* \* \* \* \* \* \*

(B) DISPOSITION OF LESS THAN ENTIRE INTEREST.—The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced, but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interests in the partnership during the taxable year.

The regulations under section 706(c)(2)(B) do not provide the manner in which the partner's varying interest distributive share shall be calculated or allocated.[5]

We therefore have two sections within subchapter K that

---

[4]During the years in issue, sec. 704(b) provided as follows:

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

[5]Sec. 1.706–1(c)(4), Income Tax Regs., provides:

Sec. 1.706–1. Taxable years of partner and partnership.

\* \* \* \* \* \* \*

(c) *Closing of partnership years—* \* \* \*

\* \* \* \* \* \* \*

(4) *Disposition of less than entire interest.* If a partner sells or exchanges a part of his interest in a partnership, or if the interest of a partner is reduced, the partnership taxable year shall continue to its normal end. In such case, the partner's distributive share of items which he is required to include in his taxable income under the provisions of section 702(a) shall be determined by taking into account his varying interests in the partnership during the partnership taxable year in which such sale, exchange, or reduction of interest occurred.

attempt to define the distributive share of a partner: section 704, which provides generally that the partnership agreement shall determine the partner's distributive share of profits and losses, and section 706(c)(2)(B), which provides that the distributive share of a partner, who has transferred part of his interest by sale or exchange or whose interest is otherwise reduced, shall be determined by taking into account his varying interests in the partnership during the taxable year. In *Moore v. Commissioner*, *supra*, and *Marriott v. Commissioner*, *supra*, this Court held that, where there is a transfer of a partnership interest during the taxable year, section 706(c)(2) supersedes section 704. 70 T.C. at 1032; 73 T.C. at 1139. The question in the instant case is not whether section 706(c) supersedes section 704(a). We must decide whether section 706(c) applies to the admission of new partners or only applies to the transfer by a partner of a partnership interest.

Petitioners argue that section 706(c)(2)(B) governs only situations where less than an entire interest is sold or exchanged. Petitioners reason that admission of a new partner is not a sale or exchange and therefore section 706(c)(2)(B) is inapplicable. Respondent, on the other hand, argues that any reduction of a partner's capital interest in the partnership triggers the application of section 706(c)(2)(B) and that the retroactive allocation of partnership losses is prohibited. In respondent's view, section 706(c)(2)(B) applies to both the sale or exchange of a partnership interest by an existing partner as well as to the reduction in an existing partner's interest solely by reason of the admission of a new partner. Partners therefore must allocate losses to reflect their varying interests in the partnership during the taxable year.

After the phrase "with respect to a partner whose interest is reduced," the Tax Reform Act of 1976 inserted the parenthetical "whether by entry of a new partner, partial liquidation of a partner's interest, gift, or otherwise." Petitioners contend that the 1976 amendment establishes that section 706(c)(2)(B) was inapplicable prior to 1976 where the partner's interest was acquired directly from the partnership, as in the instant case.

However, see sec. 1.706–1(c)(2), Income Tax Regs., which addresses the determination of a partner's distributive share in the situation where the partner has transferred his entire interest in the partnership during the partnership's taxable year.

A review of the legislative history does not provide the conclusive interpretation of section 706(c)(2)(B) prior to 1976 that petitioners urge upon this Court. To the contrary, the purpose of the amendment appears to be clarification, not modification, of the law as it existed. The report of the Joint Committee on Taxation recognized that the law prior to 1976 was unclear:

Under prior law, it was unclear whether * * * [sec. 706(c)(2)(B)] pertained to the situation where a partner's proportionate interest in the partnership was reduced as the result of the purchase of an interest directly from the partnership. Consequently, it was unclear whether an incoming partner, who purchased his interest directly from the partnership, would be subject to the rule of including partnership income and loss according to his varying interests during the year. * * * [Staff of Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, p. 92 (Comm. Print 1976).]

Therefore, the purpose of the 1976 amendment was—

*to make it clear* that the varying interests rule of this provision is to apply to any partner whose interest in a partnership is reduced, whether by entry of a new partner who purchased his interest directly from the partnership, partial liquidation of a partner's interest, gift, or otherwise. Correspondingly, the provision is to apply to the incoming partner so as to take into account his varying interests during the year. In addition, regulations are to apply the same alternative methods of computing allocations of income and loss to situations falling under section 706(c)(2)(B) as those now applicable to section 706(c)(2)(A) situations (sale or liquidation of an entire interest). * * * [Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, *supra* at pp. 93–94. Emphasis added.]

Accordingly, we find that the varying interest rule of the Tax Reform Act of 1976 codified prior law and therefore is equally applicable to the years in issue.

Petitioners further contend that the "reduced interest" language relied on by respondent refers to an economic interest and not a capital interest. We believe that the reference in subchapter K to a partner's "interest" can be a reference either to the capital interest or to the profit and loss interest of each partner. We will not define that term differently in section 706(c)(2)(B). Petitioners in effect request the Court to consider the fair market value of the original partners' equity in the partnerships, both before and after the transfer, to redetermine whether the original partners' interests have been "reduced" and whether section 706(c)(2)(B) is applicable. To ignore the common meaning of the term "interest" and to create an equity test within section

706(c) would not further the purposes of the section or subchapter K. As construed by this Court, the purpose of section 706(c)(2)(B) is to insure that the transferor of a partnership interest reports his share of partnership profits and losses prior to the transfer. We will not construe section 706(c)(2)(B) in such a manner as to allow petitioners to do indirectly what they could not do directly by requiring, in effect, an appraisal of the partnerships' assets, before and after the admission of new partners.

Prior to the admission of the new partners, petitioner Richardson owned 50–, 33.3–, and 25-percent capital interests in the three partnerships, respectively. After the admission of the new partners, he had effectively transferred all but 1 percent of his capital interest in each of the partnerships. We find that the admission of the new partners resulted in a reduction of the original partners' interests within the meaning of section 706(c)(2)(B). Accordingly, the original partners must report their distributive shares of partnership items for the period prior to and after the admission of the new partners in accordance with their varying interests in the partnerships during the year. They are prohibited from making a retroactive allocation to the new partners.

Having found section 706(c)(2)(B) applicable, we must determine the proper method of computing allocation of income or losses to each period. As previously noted, the regulations under section 706(c)(2)(B) provide no specific formula. Petitioners seek to utilize an interim closing of the books method, and respondent contends that such a method was not permissible under section 706(c)(2)(B) prior to 1976.

In *Moore v. Commissioner, supra,* we stated that any reasonable method of allocating profits and losses for the period prior to and after the sale or exchange of partnership interests is acceptable. 70 T.C. at 1035. See *Marriott v. Commissioner*, 73 T.C. at 1139. We reached this conclusion by relying on the regulations under section 706(c)(2)(A), which address the method of allocation on the sale or exchange of a partner's entire interest in the partnership. See sec. 1.706–1(c)(2), Income Tax Regs. See also *Moore v. Commissioner, supra* at 1035.

In *Moore, Marriott,* and the instant case, we have indicated that it is our belief that section 706(c)(2)(B) was enacted to put on par a partner who transfers a partial interest in a partnership

with one who sells or exchanges an entire interest. To support this conclusion, we note that the Tax Reform Act of 1976 included both clarifying amendments to section 706(c) and the requirement that regulations be promulgated to allow allocation under subsection (b) as were allowed under section 706(c)(2)(A). See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, *supra*. As stated earlier, we view the amendments to this section as clarifying restatements of the then-existing law. Accordingly, petitioners may use an interim closing of the books method, allocation of yearend totals of income or loss ratably over the year, or any other reasonable method.

In the statutory notices, respondent allocated $\frac{1}{365}$ of the partnerships' total losses for 1974 to the new partners. Petitioners contend that the allocation under the partnership agreements, which would give 99 percent of the total losses for 1974 to the new partners, is reasonable. Alternatively, they contend that they are entitled to utilize the interim closing of the books method. Respondent contends that an interim closing of the books is unreasonable in the instant case because the deductible expenses paid on December 31, 1974, represent in part expenses incurred during the January 1 to December 30, 1974, period and therefore cannot properly be allocated to the new partners. Respondent contends that, if an interim closing of the books is allowable, the petitioners must establish with precision the exact expenses incurred and paid on December 31, 1974. Unlike the situation in *Moore*, the parties here agree on the amount of income and losses allocable to each period but dispute the propriety of allocating expenses paid on December 31, 1974, but incurred prior to that date, to the new partners.

Respondent's position is set forth in his brief as follows:

The basis for respondent's contention is that, if instead of purchasing an interest in the partnership that owns property that generates deductible expenses, the taxpayer purchases a direct individual interest in the property itself, the taxpayer would not be permitted to deduct the expenses to the extent that they were incurred and sustained prior to the purchase. Respondent contends that a taxpayer should not be permitted to use an end of the year acquisition of an interest in a partnership to obtain deductions that he could not obtain if he had purchased an undivided interest in the property itself.

Thereafter, respondent cites a number of cases that stand for the proposition that the purchaser's assumption of a deductible

expense of the seller, which accrued prior to the time of the acquisition of the property, constitutes a capital expense of the purchaser and not a deductible expense.

We believe the respondent's position is without merit. It is well recognized that subchapter K dictates that the deductibility and timing of a deduction is determined at the partnership level and by the method of accounting utilized by the partnership. W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 9.02[1], pp. 9–5 to 9–7 (1977). Respondent has conceded that the expenses here in issue were all ordinary and necessary business expenses of the partnerships for their tax years ended December 31, 1974. The record clearly established that each of the partnerships was in financial trouble and suffered from a severe cash flow problem. The utility bills of the apartment complexes were in arrears and the mortgage company was considering foreclosure proceedings. The contributions of the new partners were utilized to reduce the cash flow problems and to pay the outstanding expenses of the partnerships. While the partnerships are the trees which grew the fruit, it was the new partners' contributions which ripened the fruit to deductibility. Since the partnerships utilized the cash method of accounting and the allocation of the losses occurring on December 31, 1974, to the new partners was reasonable and reflected economic reality, we find that petitioners may utilize the interim closing of the books method for the purposes of allocating the partnerships' losses.

We now must decide the propriety of respondent's contention that the old partners' bases in the partnerships must be determined on the last day of the partnerships' taxable years.[6]

Section 704(d) provides generally that a partner's distributive share of partnership losses shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such losses occurred.[7]

---

[6]This issue affects petitoner Richardson for the year 1974 and petitioner Schneider for the year 1976.

[7]Sec. 704(d) provides:

(d) LIMITATION ON ALLOWANCE OF LOSSES.—A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership.

Respondent maintains that for purposes of the section 704(d) loss limitation, petitioners must determine the bases of their partnership interests on December 31, 1974, the end of the partnership year. Petitioners, however, contend that had the original partners "sold" their interest on December 30, 1974, their bases for loss limitation purposes would have been determined on that date. By analogy to the sale situation, petitioners contend that the partnership year should be closed and that we should determine their bases on December 30, 1974, and not December 31, 1974, when applying the section 704(d) loss limitation. While we sympathize with petitioners, we cannot agree.

Admission of new partners is not in all respects identical to a sale or exchange of a partnership interest. In the former situation, the transaction is between the new partners and the partnership. The latter situation involves a transaction between a new partner and an existing partner. When a partner sells his entire interest in a partnership, the partnership year as to that partner is closed. See sec. 706(c)(2)(A). Further, the regulations under section 705 specifically provide that a partner's adjusted basis must be determined as of the date of the sale. This is true on the sale of either an entire interest or a partial interest in the partnership. See sec. 1.705–1(a)(1), Income Tax Regs.[8] An adjustment in basis is necessary in order to determine the selling partner's true gain or loss on the sale of the partnership interest. However, on the admission of a new partner no such adjustment is necessary.

Section 706(c)(2)(B), which we have found applicable, specifically provides that the partnership year shall not close on the date when a new partner is admitted. In the face of this statutory authority and in the absence of any other section or regulation which would support the basis adjustment sought by petitioners, we find for respondent on this issue. Section 752(b) requires petitioners Richardson and Schneider to treat the amount of liability removed as a section 733 cash distribution on the date the new partners were admitted. Section 705(a)(2)

---

[8] We express no opinion with respect to the date of determination of basis for the purposes of sec. 704(d) in the event of a partial sale. See W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.10[3][a], pp. 10–68 to 10–69 (1977), for a discussion of why losses taken into account in determining gain or loss on a sale should be deductible under sec. 704(d) notwithstanding the partner's basis on the last day of the partnership year.

operates to reduce their adjusted bases in the partnerships by the amount of the section 733 cash distribution. Finally, for the purposes of determining the partners' section 704(d) limits, the partners' adjusted bases in the partnerships first must be reduced by any cash distributions under section 733 before taking into account their distributive share of partnership losses. See sec. 1.704–1(d)(2), Income Tax Regs. Respondent's calculation comports with these provisions in all respects. It is for these reasons that we sustain respondent on this issue.

The next issue for our determination is whether petitioner Richardson is entitled to reduce his gain realized under section 731 upon the admission of new partners in an amount equal to his proportionate share of partnership liabilities that were not assumed by the new partners. Respondent submits that the record has failed to "clearly establish the specifics of the alleged additional liabilities or whether such liabilities have already been accounted for in the basis computation stipulated by the parties." We disagree with respondent.

Richardson and Dyer testified that the following indebtedness of each partnership was not assumed by the new partners upon entry into the partnerships but remained the sole and personal responsibility of the old partners:

*Batture*:

| | |
|---:|---|
| $12,000 | Raceland Bank |
| 3,000 | Capital Bank |
| 15,000 | |

*Bengal I*:

| | |
|---:|---|
| $7,500 | Capital Bank |
| 5,000 | Fidelity National Bank |
| 5,000 | B & D Electric Co. |
| 17,500 | |

*Bengal II*:

| | |
|---:|---|
| $4,500 | Fidelity National Bank |
| 1,680 | Capital Bank |
| 6,320 | Louisiana National Bank (that portion of the $20,000 note) |
| 5,000 | B & D Electric Co. |
| 17,500 | |

Total.................. 50,000

We find this testimony credible and convincing. We find that petitioners have established that these liabilities existed in the amounts stated above at the time the new partners entered the partnerships and became the sole and personal obligations of the old partners. We therefore hold that, to the extent such liabilities are allocable to Richardson, his section 752(b) deemed distribution determined by respondent will be reduced as will his concomitant section 731 gain.

We next must decide whether certain payments made by each partnership to Richardson on December 31, 1974, for management and consulting services and noncompetition fees were income in 1974. Initially, we must determine whether it was proper for respondent to raise this issue in a motion at trial. The payments in question were made partly in cash and partly by the execution of promissory notes by each partnership as follows:

| Partnership | Description | Amount | Form |
|---|---|---|---|
| Bengal I | Management fees | $4,590.00 | Check |
| Bengal I | Noncompetition fees | 2,500.00 | Check |
| Bengal II | Management fees | 3,166.66 | Check |
| Bengal II | Noncompetition fees | 1,666.67 | Check |
| Batture | Management fees | 3,750.00 | Check |
| Bengal I | Noncompetition fees | 2,500.00 | Promissory note |
| Bengal II | Noncompetition fees | 1,666.67 | Promissory note |
| Batture | Noncompetition fees | 2,256.49 | Promissory note |
| Total | | 22,096.49 | |

Richardson did not include these fees in income in his 1974 Federal income tax return. The notice of deficiency addressed to Richardson did not propose any adjustment to his 1974 return with respect to the unreported receipt of these payments. At trial, we granted respondent's motion, over Richardson's objection, to amend his answer to claim an increased deficiency in income tax for 1974 for the unreported income represented by the checks received from the partnerships. On brief, respondent claimed that the unreported income included fees received in the form of checks *and promissory notes.* Richardson argued that respondent was barred by statute from claiming the increased deficiency and that the issue is not otherwise properly before the Court.

Section 6212(c) restricts respondent's right to determine an additional deficiency when a timely petition has been filed with the Tax Court. However, section 6214(a) provides this Court

with the "jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer." Under Rule 41, Tax Court Rules of Practice and Procedure, this Court may permit amendment of the pleadings "when justice so requires" or "to conform to the proof." In exercising our broad discretionary powers pursuant to Rule 41, we find that justice requires amendment of the pleadings herein. We can find no substantial prejudice to Richardson that results from the granting of this motion. See *Estate of Horvath v. Commissioner*, 59 T.C. 551 (1973), and cases cited therein.

Richardson argues that section 6212(c) bars respondent from amending his answer because such amendment is tantamount to the sending of a second statutory notice. We disagree. Richarson relies on *Hickman v. Commissioner*, 24 B.T.A. 438 (1931), and *McCue v. Commissioner*, 1 T.C. 986 (1943). His reliance is misplaced, however, because both of those cases involved the *actual* issuance of a second statutory notice. In the instant case, the amendment is not a second statutory notice. We have granted respondent's motion to amend his answer pursuant to our authority under section 7453 and Rule 41, Tax Court Rules of Practice and Procedure, and, therefore, this issue was properly raised before this Court.

Under the circumstances, because respondent has asserted an increased deficiency at trial, the burden of proof rests in his corner. Rule 142(a), Tax Court Rules of Practice and Procedure. It is uncontroverted that petitioner Richardson received the subject checks from the partnerships during 1974. Therefore, petitioner Richardson has clearly acceded to wealth and must report the amount of the checks as income in the year received. Sec. 61. See also *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955).

However, respondent further asserts that the face amounts of the promissory notes received by Richardson, a cash basis taxpayer, in 1974 from the partnerships also should have been included in income in that year. As we pointed out in *Ennis v. Commissioner*, 17 T.C. 465, 470 (1951), only "cash or its equivalent" constitutes income to a cash basis taxpayer. We further stated that "In determining what obligations are the 'equivalent of cash' the requirement has always been that the obligation, like money, be freely and easily negotiable." 17 T.C. at 470.

Respondent has not offered evidence concerning the negotiability or transferability of the subject promissory notes. Respondent has failed to meet his burden of proof. We therefore hold that the face amount of such promissory notes are not includable in Richardson's income in 1974.

Petitioner Richardson has asked the Court for attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. sec. 1988. In *Key Buick Co. v. Commissioner*, 68 T.C. 178, 184 (1977), affd. 613 F.2d 1306 (5th Cir. 1980), we held that this Court has no authority to award attorney's fees. On appeal, the Fifth Circuit, where an appeal lies in the instant case, stated:

We are not in accord, however, with the conclusion of the Tax Court that it may never award attorney's fees under any circumstances because it is not empowered to assess costs in actions before it. In any instance in which a taxpayer is cast in a defendant's role before it, sec. 1988 empowers the Tax Court to award attorney's fees and assess same as costs. [613 F.2d at 1309.]

In order for Richardson to receive attorney's fees, we must find that (1) Richardson was "cast in a defendant's role," and (2) respondent acted in an unreasonable, harassing, or frivolous manner in asserting the aforementioned additional deficiency. See *Jones v. United States*, 613 F.2d 1311, 1313 (5th Cir. 1980). We have, in the main, sustained respondent's position with respect to the additional deficiency. Respondent's conduct was not unreasonable, harassing, or frivolous. To the contrary, he acted properly in fulfilling his duties as a Government official and public servant. Therefore, petitioner Richardson's request for attorney's fees is denied.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*