Dated: the 21st day of May, 1981

JOSEPH A. ROCCAFORTE, JR., AND SANDRA F. ROCCAFORTE, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6144–79—6148–79.     Filed August 10, 1981.

---

[1]Cases of the following petitioners are consolidated herewith: Clarence M. Neher and Eileen B. Neher, docket No. 6145–79; Robert E. Wales and Gwynne G. Wales, docket No. 6146–79; Robert J. Zernott and Eleanor M. Zernott, docket No. 6147–79; and Carl L. Hancock and Alice D. Hancock, docket No. 6148–79.

*D. Irvin Couvillion*, for the petitioners.
*Dennis M. Kelly*, for the respondent.

STERRETT, *Judge*: By statutory notices dated April 9, 1979, respondent determined deficiencies in petitioners' income taxes for the taxable years ended December 31, 1975, and December 31, 1976, as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 6144–79 | Joseph A. Roccaforte, Jr., and Sandra F. Roccaforte | 1975 | $5,416.41 |
| | | 1976 | 909.31 |
| 6145–79 | Clarence M. Neher and Eileen B. Neher | 1975 | 21,155.13 |
| | | 1976 | 1,014.47 |
| 6146–79 | Robert E. Wales and Gwynne G. Wales | 1975 | 2,219.82 |
| | | 1976 | 1,058.75 |
| 6147–79 | Robert J. Zernott and Eleanor M. Zernott | 1975 | 2,907.10 |
| | | 1976 | 1,140.27 |
| 6148–79 | Carl L. Hancock and Alice D. Hancock | 1975 | 3,141.14 |
| | | 1976 | 1,285.59 |

These cases have been consolidated for purposes of trial, briefing, and opinion.

After concessions, the issues are (1) whether the ownership and operation of the Glenmore Manor Apartments, and losses therefrom, are attributable to Glenmore Manor Apartments, Inc. (corporation), or whether the individual petitioners, as partners in Glenmore Manor Apartments Partnership (part-

nership), are entitled to claim losses attributable to the operation of the apartment complex in 1975 and 1976; (2) if the losses are attributable to the partnership, whether partners admitted on December 31, 1975, may share in the profits and losses of the partnership for the entire 1975 taxable year; and (3) if the partners admitted on December 31, 1975, are not entitled to preadmission profits and losses, how should profits and losses be allocated to each partner.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

All of the petitioners were residents of Baton Rouge, La., at the time their respective petitions were filed herein. All filed timely joint Federal income tax returns with the Internal Revenue Service Center at Austin, Tex.

During the latter part of 1972, Jack N. Dyer, Sr., Jack N. Dyer, Jr., and Ronald P. Dyer (the Dyers) made plans to acquire real estate in Baton Rouge, La., for purposes of building and operating an apartment complex thereon. The real estate chosen by the Dyers as the site for the complex was known as lot F of the Bauman Home Place. After negotiating with the owners of the real estate, the site was purchased on March 19, 1973, by Jack N. Dyer, Sr., and Jack N. Dyer, Jr., as individuals, for $76,000. Of this amount, $73,500 was borrowed from the Louisiana National Bank of Baton Rouge and was secured by a mortgage on the property.

In order to finance the development of an apartment complex on the property, Jack N. Dyer, Jr., actively sought investors. In return for cash contributions toward the project, equity interests were offered. From November 1972 until June 1973, ten individuals (owners) contributed the following amounts for the indicated partnership interests in the proposed apartment complex:

| Name | Cash contributed | Percentage partnership interest |
|---|---|---|
| Robert J. Zernott | $6,500 | 5.0 |
| Raymond Willhoft | 8,000 | 5.0 |

| | | |
|---|---:|---:|
| Frederick G. Willhoft | $8,000 | 5.0 |
| George M. Bonfanti | 6,400 | 5.0 |
| Frank H. Brigsten | 6,400 | 5.0 |
| Charles D. Sylvest | 6,500 | 5.0 |
| Robert E. Wales | 6,500 | 5.0 |
| Carl L. Hancock | 6,500 | 5.0 |
| Ernest R. Caston, Jr | 6,200 | 5.0 |
| Eva B. Dyer | 7,200 | 15.0 |
| | 68,200 | 60.0 |

The remaining partnership interests were held as follows:

| | Cash contributed | Percentage partnership interest |
|---|---|---:|
| Ronald P. Dyer | | 13.33 |
| Jack N. Dyer, Sr | | 13.33 |
| Jack N. Dyer, Jr | | 13.34 |
| | | 40.00 |

All cash contributions were paid to JDA Realty, Inc., a corporation owned by Jack N. Dyer, Sr., and Jack N. Dyer, Jr., and were held in escrow to pay various expenses associated with the project. Each of the investors, at the time of his or her contribution, signed a one-page agreement which provided that the payment made therewith was in consideration for a "partnership interest in the proposed apartment complex known as Glenmore Manor," and that either a general partnership, a limited partnership, or a nominee corporation would be utilized as the vehicle for development of the apartment project, and that Jack N. Dyer, Sr., and Jack N. Dyer, Jr., were to function either as "general partner or the nominee in charge of operating and management decisions."

While seeking investors during 1972 and 1973, the Dyers investigated and negotiated with various lending institutions to obtain interim construction financing and permanent financing for the planned apartment complex. In August 1973, they personally received commitment letters in the amount of $635,000 for interim financing and a like amount for permanent financing. The commitment for permanent financing was made contingent upon its being structured through a corporation.

On September 26, 1973, nine of the investors[2] and the three Dyers executed an agreement (ownership agreement) giving each the right to acquire an undivided ownership interest in the property in the same proportion as his or her percentage interest in the partnership. In addition, liability would be limited to each partner's proportionate interest. The effect of the ownership agreement was to create Glenmore Manor Apartments Partnership, a Louisiana ordinary (general) partnership.

On October 5, 1973, Glenmore Manor Apartments, Inc., was organized for the stated purpose of engaging in any lawful activity for which corporations may be formed under Louisiana law. Robert J. Zernott, a petitioner herein, was named as president of the corporation; George M. Bonfanti, as vice president; and Jack N. Dyer, Jr., as secretary-treasurer. The same three individuals were directors. A total of 2,000 authorized shares of common stock was issued to the 13 co-owners of the Glenmore Manor Apartments Partnership in the following amounts and percentages:

| Shareholder | Number of shares | Percentage ownership |
| --- | --- | --- |
| Robert J. Zernott | 100 | 5.000 |
| Raymond Willhoft | 100 | 5.000 |
| Frederick G. Willhoft | 100 | 5.000 |
| George M. Bonfanti | 100 | 5.000 |
| Frank H. Brigsten | 100 | 5.000 |
| Charles D. Sylvest | 100 | 5.000 |
| Robert E. Wales | 100 | 5.000 |
| Carl L. Hancock | 100 | 5.000 |
| Ernest R. Caston, Jr | 100 | 5.000 |
| Eva B. Dyer | 300 | 15.000 |
| Ronald P. Dyer | 267 | 13.335 |
| Jack N. Dyer, Sr | 266 | 13.330 |
| Jack N. Dyer, Jr | 267 | 13.335 |
| | 2,000 | 100.000 |

---

[2]Charles D. Sylvest, one of the initial investors, did not execute the agreement. On Sept. 23, 1974, he withdrew from the venture and received a capital withdrawal in the amount of $9,000. Upon the agreement of the other investors, the three Dyers purchased the interest previously held by Sylvest for a capital contribution of $9,000. See note 5 *infra*.

None of the stockholders paid or contributed any cash or other consideration to the corporation for the stock.

On the same date, Glenmore Manor Apartments, Inc., and the 13 partners and co-owners executed an agreement (nominee agreement) wherein it was stated that the corporation would act as the nominee of the co-owners. The corporation was given authority to hold legal title to the real estate and to act with respect to the property in accordance with the owners' written authorization and instruction. The agreement stated, in pertinent part, that "The nominee shall have no authority to and shall not take any action, sign any document, make any decisions, or do or perform any act whatsoever pertaining to owners' property, which involves the discretion or judgment of nominee, but shall act, at times, only upon written consent or authorization of owners expressed and provided in this agreement or any subsequent direction or authorization." In addition, it was acknowledged that beneficial or equitable interest in the property would remain in the co-owners. All rents or other proceeds collected by the corporation were to be remitted to the owners. In return for its services, the corporation was to be reimbursed for the actual cost of services rendered and was not to be paid any amount as a fee for performing such services. Jack N. Dyer, Jr., and Robert J. Zernott were authorized to direct the corporation with respect to actions on behalf of the partnership.

The corporation had no assets, liabilities, income, or expenses. It was formed solely to receive loan proceeds from the construction and permanent lenders in order to accommodate the lenders in avoiding the State usury laws.[3]

On October 8, 1973, a letter signed by Robert J. Zernott and Jack N. Dyer, Jr., was sent to Jack N. Dyer, Jr., in his capacity as secretary-treasurer of the corporation. Among other things, the corporation was instructed to take title to the property, to enter into a construction contract, to arrange and sign agreements for interim and permanent financing, to accept the project upon the completion of construction, and to take

---

[3]The lawful rate of interest permissible under Louisiana law on obligations secured by a mortgage on real property was 10 percent during 1973. La. Rev. Stat. Ann. sec. 9:3503 (West). Corporations were exempt from restrictions on interest rates. La. Rev. Stat. Ann. sec. 12:703 (West).

steps to get the apartments occupied in order to meet the "rent roll" requirements of the permanent lender.

About 3 weeks later, on October 29, 1973, Jack N. Dyer, Sr., and Jack N. Dyer, Jr., transferred lot F of the Bauman Home Place to Glenmore Manor Apartments, Inc., in return for stated cash consideration of $76,000. The corporation planned to use part of the proceeds of an interim financing loan to finance the purchase of the property. No money or other property, however, was paid by the corporation to the Dyers on the date that the real estate was transferred.

On November 1, 1973, Glenmore Manor Apartments, Inc., executed a mortgage note in favor of Louisiana National Bank of Baton Rouge in order to secure interim financing in the amount of $635,000 for construction of the Glenmore Manor Apartments complex. As required by the construction lender, Jack N. Dyer, Sr., and Jack N. Dyer, Jr., personally guaranteed the $635,000 note. The note was secured by the real estate and all improvements built thereon, was payable on demand, and carried an interest rate equal to 3 percent over the best commercial rate (upper tier) of the Chase Manhattan Bank of New York. The best commercial interest rate of the Chase Manhattan Bank was 9.75 percent as of October 23, 1973; it decreased to 9.5 percent as of November 2, 1973. On November 1, 1973, the interest rate applicable to this loan was 12.75 percent (9.75 + 3.00). The Louisiana National Bank of Baton Rouge would not finance the $635,000 interim construction loan to individuals or to a partnership at so favorable a rate of interest. See note 3 *supra*.

Howard E. Samuel, senior vice president (corporate finance division) and senior loan officer of Louisiana National Bank during 1973 and 1974, was aware that the construction mortgage had been executed by Glenmore Manor Apartments, Inc. He also knew that the corporation was a mere shell. Because the corporation had no assets other than the apartment complex, the bank required the underlying owners of the project (Jack N. Dyer, Sr., and Jack N. Dyer, Jr.) personally to guarantee the loan. In addition, in early 1974 (after the construction loan was made), the credit department of Louisiana National Bank requested copies of the corporation's most recent financial statements. Jack N. Dyer, Jr., responded, in part, as follows:

The above captioned corporation is a Nominee Corporation. This means that the corporation was formed solely for the purpose of receiving loan proceeds from the permanent lender and the interim lender. This corporation has no assets, it has no liabilities, it has no income, and it has no expenses. This corporation functions solely as an agent in order to accommodate the lender to avoid subjecting the permanent and the interim lenders to the State Usury Laws.

On November 23, 1973, shortly after the interim construction financing arrangement had been undertaken, the partners of Glenmore Manor Apartments Partnership entered into an agreement (agency agreement) with Glenmore Manor Apartments, Inc.[4] The agreement designated the corporation as agent for the partnership in connection with the apartment project and reaffirmed both the nominee agreement of October 5, 1973, previously cited, and the fact that the individual partners were the owners of the property. In doing so, the agency agreement recited the fact that the corporation had been formed merely to accommodate the partners in acquiring and developing the property and obtaining interim and permanent financing therefor. The agreement stated that the mortgage financing was to be made to the corporation solely because of the requirements of the lending banks. In addition, the corporation, as agent, disclaimed any ownership interest or claim to the real estate or the apartments to be built thereon. The agreement further stated that lenders on the project would be advised that Glenmore Manor Apartments, Inc., was an agent for the owners and had no interest in the property; that even if the principal/agent relationship were not disclosed to third parties, such debts were the obligations of the owners and not of the corporation; that the owners would hold the corporation harmless from all liabilities arising from the project; and that in the event of proceedings against the corporation, the owners could be brought into the litigation as third-party defendants. Finally, the corporation agreed that it would not engage in any business activities except pursuant to the directions of the owners.

Glenmore Manor Apartments, Inc., contracted with JDA Construction, Inc., on October 30, 1973, for construction of the apartment complex to be known as the Glenmore Manor

---

[4]Charles D. Sylvest did not execute the agreement. See note 2 *supra*.

Apartments. In addition to being the moving party behind the formation of Glenmore Manor Apartments, Inc., Jack N. Dyer, Jr., was also owner of JDA Construction, Inc.

As construction of the apartment project proceeded, it became evident that the final costs would substantially exceed the initial cost projections. It was determined by the developers, Jack N. Dyer, Sr., and Jack N. Dyer, Jr., that permanent financing in the amount of $750,000 would be required rather than the $635,000 initially planned. The construction lender, Louisiana National Bank, agreed to provide the extra amounts needed to complete construction of the project. However, the permanent lender, Life Investors Insurance Co. of America, was unwilling to increase its permanent financing commitment to $750,000. As a result, the developers were compelled to seek other permanent financing. Jack N. Dyer, Sr., and Jack N. Dyer, Jr., applied to Collateral Investment Co., Birmingham, Ala., for assistance in obtaining substitute permanent financing in the amount of $750,000.

As a result of the application with Collateral Investment Co., First Federal Savings & Loan Association of Pittsburgh, Pa. (First Federal), made a commitment for the desired amount of permanent financing. First Federal's loan commitment letter, dated June 4, 1974, referred to "Jack N. Dyer, Sr., and Jack N. Dyer, Jr., General Partners of a Limited Partnership," as the mortgagor, and required the mortgage to be personally guaranteed by Jack N. Dyer, Sr., Jack N. Dyer, Jr., and their wives.

On July 12, 1974, construction of the apartment complex was completed and the work was accepted by Glenmore Manor Apartments, Inc., as owner.

The permanent loan of $750,000 on Glenmore Manor Apartments was closed on October 3, 1974, by the execution of a note and mortgage by Glenmore Manor Apartments, Inc., in favor of Collateral Investment Co. The entire amount of the note and mortgage, both of which were full recourse obligations, was personally guaranteed by Jack N. Dyer, Sr., Jack N. Dyer, Jr., and their spouses. On the same date, the note was assigned, without recourse, by Collateral Investment Co. to the permanent lender, First Federal. The assignment agreement internally referred to First Federal's commitment letter of June 4, 1974, thereby reaffirming the fact that First Federal

clearly was apprised of the relationship between the Dyers, the partnership, and Glenmore Manor Apartments, Inc. Although First Federal became holder of the note, Collateral Investment Co. remained as servicing agent, retained responsibility for monthly collections of principal and interest, and otherwise represented First Federal under the terms of the mortgage.

Subsequent to the closing of the permanent loan, Collateral Investment Co., in its role as servicing agent, wrote to Jack N. Dyer, Jr., on two occasions to request certified financial statements for Glenmore Manor Apartments, Inc. Dyer responded that:

> Glenmore Manor Apartments, Inc. the Mortgagor Corporation is an Agent for the underlining [sic] Partnership of owners of the Glenmore Manor Apartments. The Corporate Agent has no income, no expenses and no assets. Its only function is to act as Agent for receipt of loan proceeds in the State of Louisiana. Although, Glenmore Manor Apartments, Inc. has no financial condition, I attach hereto a copy of the most recent Federal Income Tax Return on Glenmore Manor Apartments, Inc.

Dyer also provided Collateral Investment Co. with the names, addresses, and percentage ownership of the partners in Glenmore Manor Apartments Partnership.

Because of the increased costs in the construction of the project, and in order to enable the investors to attain their original investment objectives based upon a $635,000 permanent indebtedness, the Dyers agreed to reduce their capital interests in the project from a combined 40-percent interest to a combined 20-percent interest and to increase the combined interests of the investors from 60 percent to 80 percent. The change in the ownership interests of the partners was effected by a written instrument dated September 23, 1974. In accordance with this agreement, the interests of all partners in the partnership were redetermined as follows:

| | Percentage of capital ownership | |
|---|---|---|
| Partner | 9/26/73–9/23/74 | 9/23/74–12/30/75 |
| Robert J. Zernott | 5.00 | 6.67 |
| Raymond Willhoft | 5.00 | 6.67 |
| Frederick G. Willhoft | 5.00 | 6.67 |
| George M. Bonfanti | 5.00 | 6.67 |
| Frank H. Brigsten | 5.00 | 6.67 |
| Charles D. Sylvest | 5.00 | --- |

| | | |
|---|---|---|
| Robert E. Wales ..................... | 5.00 | 6.67 |
| Carl L. Hancock ..................... | 5.00 | 6.67 |
| Ernest R. Caston, Jr............... | 5.00 | 6.67 |
| Eva B. Dyer.......................... | 15.00 | 20.00 |
| Ronald P. Dyer...................... | 13.33 | 8.88 |
| Jack N. Dyer, Sr ................... | 13.33 | 8.88 |
| Jack N. Dyer, Jr ................... | 13.34 | [5] 8.88 |
| | 100.00 | 100.00 |

Certain of the furniture and equipment used at the Glenmore Manor Apartments complex was leased from the Louisiana National Leasing Corp., a subsidiary of the Louisiana National Bank of Baton Rouge. The lease, providing for 50 monthly rental payments of $1,271.09, was executed on October 2, 1974, by Glenmore Manor Apartments, Inc., and was personally guaranteed by Robert E. Wales, Carl L. Hancock, Robert J. Zernott, and Jack N. Dyer, Jr.

A checking account was maintained in the name of Glenmore Manor Apartments, Inc., with Louisiana National Bank of Baton Rouge from November 23, 1973, to October 31, 1974, at which date the account was closed. The account was used solely to deposit each of the advances on the $635,000 construction loan, to make payments to the building contractor, JDA Construction, Inc., for work in progress, and to pay Louisiana National Bank for interest due on the construction loan. Neither proceeds from operation of the apartment complex nor any of the capital contributions of investors were ever deposited in the account of Glenmore Manor Apartments, Inc.

After construction was completed and the project was placed in service, the daily operations of Glenmore Manor Apartments were managed by JDA Property Management, Inc., a corporation owned by Jack N. Dyer, Jr. As compensation for daily maintenance and management supervision, JDA Property Management, Inc., was paid a fee of 5 percent of the gross rental income. Lease agreements with tenants of Glenmore Manor Apartments were entered into by JDA Property Management, Inc., as landlord, and were executed by the

---

[5] The indicated partnership interests of Ronald P. Dyer, Jack N. Dyer, Sr., and Jack N. Dyer, Jr., include each one's share of the 6.666-percent interest acquired from Charles D. Sylvest in 1974. See note 2 *supra*.

apartment complex manager, an employee of JDA Property Management, Inc.

Funds received from the rental operations of the project were recorded on the books of JDA Investment Properties, Inc. (account code 820), a corporation owned by Jack N. Dyer, Jr. Initially, the funds were deposited in a checking account with American Bank & Trust Co. of Baton Rouge, La., in the name of "JDA Investment Properties." From April 1975 to December 31, 1975, the funds were deposited in a checking account with Louisiana National Bank of Baton Rouge under the name of "JDA Glenmore Manor 820." From May 22, 1975, to July 16, 1975, a checking account also was maintained for the project with Baton Rouge Bank & Trust Co. of Baton Rouge, La., in the name of "JDA Glenmore Manor Apts., Accounting Code 820." Other than the original checking account with the Louisiana National Bank, none of the accounts with either Louisiana National Bank, Baton Rouge Bank & Trust Co., or American Bank & Trust Co. were accounts of Glenmore Manor Apartments, Inc.

The project, once completed and in service, continually experienced cash-flow problems. During 1975, the apartments were never more than 75- to 80-percent occupied. Revenues from operations were not sufficient to pay expenses, and the project could not meet all creditors' payment demands on a timely basis. The partners met on May 14, 1975, to discuss ways to raise additional capital to fund the deficits in cash flow. On May 20, 1975, at the written direction of the 12 Glenmore Manor Apartments partners, Glenmore Manor Apartments, Inc., negotiated a loan in the amount of $90,000 from the Baton Rouge Bank & Trust Co. The loan was payable on demand, bore an interest rate of 10 percent per year, and was secured by a second mortgage on the property and personal endorsements of $6,000 each by Robert E. Wales, Frederick G. Willhoft, Raymond Willhoft, Frank H. Brigsten, Carl L. Hancock, George M. Bonfanti, and Robert J. Zernott, as individuals. The three Dyers also endorsed the $90,000 demand note as continuing guarantors. Shortly after the mortgage and the note were signed, the Baton Rouge Bank & Trust Co., requested, and Jack N. Dyer, Jr., provided, a complete list of the names and addresses of all of the owners of the Glenmore Manor Apartments complex.

Despite the $90,000 loan, the project continued to fail to generate enough money to meet its bills. The monthly payment schedule for 1975 on the $750,000 permanent mortgage reflected a total of seven assessments for late charges against the project during that year. The utility company providing electric service to the project issued at least three notices in 1975 threatening to discontinue service unless the past-due utility bills were paid. The notice of disconnection of electric service dated December 23, 1975, was addressed directly to Jack N. Dyer, Jr.

On December 12, 1975, a letter was sent to all partners of Glenmore Manor Apartments Partnership by Jack N. Dyer, Jr., advising that the partnership was in need of an additional $40,000 capital to defray the cost of overdrafts, for the payment of $15,000 principal on the $90,000 second mortgage owing to Baton Rouge Bank & Trust Co., and for account liquidity. The letter requested each partner with a 6.67-percent capital interest to make a capital contribution in the amount of approximately $2,668. The letter further provided that, with respect to those partners who did not make a capital contribution, the partnership would admit additional partners into the partnership for equivalent capital contributions, and the capital interests of those partners not making a capital contribution would be reduced and allotted to the new partners.

As a result of the letter of December 12, five partners made the requested contribution at various times between December 12, and December 31, 1975: Robert J. Zernott, Robert E. Wales, Carl L. Hancock, Frank H. Brigsten, and Raymond Willhoft.[6] Seven of the existing partners made no contributions. On December 31, 1975, David M. Neher and petitioners Joseph A. Roccaforte, Jr., and Clarence M. Neher (the new partners) were admitted into Glenmore Manor Apartments Partnership as general partners for a combined 10-percent capital interest in the project. The three new investors made capital contributions to the partnership as follows:

---

[6] The contribution of the fifth partner, Raymond Willhoft, was made on Dec. 31, 1975, by Jack N. Dyer, Sr., Jack N. Dyer, Jr., Ronald P. Dyer, and Eva B. Dyer pursuant to an agreement of intent by the Dyers to acquire Willhoft's interest. Willhoft's entire interest in the partnership and the corporation was acquired by the four Dyers on Apr. 2, 1976.

|  | Amount contributed | Percentage partnership interest |
|---|---|---|
| Joseph A. Roccaforte, Jr | $6,133.34 | 2 |
| Clarence M. Neher | 15,333.30 | 5 |
| David M. Neher | 9,199.98 | 3 |
|  | 30,666.62 | 10 |

The interests of the new partners were evidenced by a written partnership agreement dated December 31, 1975. In the partnership agreement of December 31, 1975, 67.51 percent of the profits and losses of the partnership for 1975 was allocated to the new partners, 31.81 percent was allocated to the five existing partners who made contributions, and 0.68 percent was allocated to the seven partners who made no contributions. For succeeding tax years, these partners were allocated profits and losses according to their capital interests.

At the time of their entry into the partnership, the new partners believed that the corporation was an agent for the partnership. Petitioner Joseph A. Roccaforte, Jr., would not have invested in the project if he thought that his contribution was an investment in a corporation. Rather, his investment was prompted by his belief that the apartment complex was owned by the partnership and not by Glenmore Manor Apartments, Inc. No capital stock in Glenmore Manor Apartments, Inc., was issued to the three new partners.

As a result of the capital contributions by some of the existing partners and the new partners, the capital interests of the partners in Glenmore Manor Apartments Partnership were redetermined as follows:

| Partner | Percentage capital ownership 12/31/75–12/31/76 |
|---|---|
| Robert J. Zernott | 6.666 |
| Raymond Willhoft | 6.666 |
| Frederick G. Willhoft | 5.670 |
| George M. Bonfanti | 5.670 |
| Frank H. Brigsten | 6.666 |
| Charles D. Sylvest | |
| Robert E. Wales | 6.666 |
| Carl L. Hancock | 6.666 |
| Ernest R. Caston, Jr | 5.670 |
| Eva B. Dyer | 17.000 |

| | |
|---|---|
| Ronald P. Dyer | 7.550 |
| Jack N. Dyer, Jr | 7.560 |
| Jack N. Dyer, Sr | [7]7.550 |
| Joseph A. Roccaforte, Jr | 2.000 |
| David M. Neher | 3.000 |
| Clarence M. Neher | 5.000 |
| | 100.000 |

The Glenmore Manor Apartments Partnership filed its tax returns for each calendar year on the cash basis of accounting. On December 31, 1975, expenses in the amount of $20,059.39 were paid for deductible operating expenses for obligations incurred prior to December 30, 1975. Deductible expenses in the amount of $9,422.99 were paid on December 31, 1975, for liabilities due in January 1976. The parties have agreed that no income was received by Glenmore Manor Apartments Partnership on December 31, 1975. The money for the expense payments came from capital contributions made by some of the existing partners and the new partners admitted into the partnership. None of the contributions made to the partnership in December 1975 were used to make capital distributions to any of the partners. The contributions were used exclusively to pay outstanding bills on the apartment complex.

Glenmore Manor Apartments, Inc., filed Federal corporate income tax returns, Forms 1120, for the calendar years 1973, 1974, 1975, and 1976, but reported no income, losses, assets, or liabilities. On its returns, the corporation indicated that it was a "nominee corporation" and that it engaged in "no activity."

On May 29, 1980, the State of Louisiana Department of Revenue and Taxation assessed the petitioners herein for additional State income taxes for 1975 and 1976. The assessments were based upon the disallowance of losses reported by petitioners from the Glenmore Manor Apartments Partnership. Pursuant to State law, petitioners filed a petition with the Board of Tax Appeals for the State of Louisiana for the purpose of having the assessments redetermined. On August 25, 1980, the State Department of Revenue and Taxation informed the Board of Tax Appeals that the State would not oppose the petition. Accordingly, judgment was rendered by

---

[7]See note 5 *supra.*

the Board of Tax Appeals in favor of petitioners on September 11, 1980, allowing the losses reported from Glenmore Manor Apartments Partnership.

## OPINION

At the outset we are faced with the issue of whether losses incurred as a result of ownership of the Glenmore Manor Apartments complex for the taxable years 1975 and 1976 should be attributed to Glenmore Manor Apartments, Inc., or to the partnership. If we find that the corporation was the real owner of the apartment development, we need not face the other issues presented.

The loss deductions claimed by petitioners are based upon the contention that such amounts were their proper distributive shares of losses sustained by a partnership of which they were members. Petitioners submit that the losses were sustained by the partnership through its ownership of Glenmore Manor Apartments during the years in issue. Although a corporation was formed to facilitate construction of the apartment complex, petitioners assert that the corporation was a bona fide agent of the partnership. As such, petitioners claim that the actions of the corporation for or on behalf of the partnership should be attributed to the partnership.

Respondent, on the other hand, asserts that income and losses from the apartment complex should be attributed to the corporation. Glenmore Manor Apartments, Inc., was a separate taxable entity whose business purpose and activities related entirely to the complex. It was the legal owner of the assets that generated the taxable losses during 1975 and 1976, and therefore should be responsible for reporting the taxable events on its returns.

From the outset, petitioners concede that the corporate form should not be disregarded. On brief, petitioners admit that the corporation was a viable entity. They admit the obvious inconsistency inherent in prior cases wherein taxpayers would argue, on the one hand, that the corporate entity should be disregarded, and on the other hand, that the corporation was their agent. See, e.g., *Strong v. Commissioner*, 66 T.C. 12, 21 (1976), affd. without opinion 553 F.2d 94 (2d Cir. 1977); *Harrison Property Management Co. v. United States*, 201 Ct. Cl. 77, 475 F.2d 623, 626–627 (1973), cert. denied 414 U.S. 1130

(1974). Therefore, we need consider only whether Glenmore Manor Apartments, Inc., functioned as an agent for the partnership, or whether the corporation, itself, was the proper taxable entity. We need not consider as controlling those cases dealing solely with whether a corporation should be disregarded.[8]

We begin by repeating the well-established doctrine of corporate entity:

Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creditor's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [*Moline Properties v. Commissioner*, 319 U.S. 436, 438–439 (1943). Fn. refs. omitted.]

In *Moline*, the Supreme Court considered whether the existence of a corporation should be ignored for purposes of determing whether income on the sale of real property should be taxed to a corporation or its sole shareholder. The Court held that the corporate entity should be respected because it was organized for valid business purposes, had a special function from its inception and carried on unambiguous business activities subsequent to its formation. 319 U.S. at 440. The Supreme Court went on to reject petitioner's argument that there were sufficient facts to find that that corporation was an agent for its sole shareholder. However, the justices recognized that a factual setting might exist where a court could accept the agency argument. They left further definition and resolution of the issue to another day.

The *Moline* decision is not conclusive with respect to the facts in the instant case. Factual differences between the two require us to consider further the agency argument. For instance, in *Moline*, there was neither an agency contract nor did any of the usual incidents of an agency relationship exist. 319 U.S. at 440. However, in the instant case, the agency issue is presented clearly. An agency agreement was memorialized

---

[8]For a discussion of the distinction between "agency" cases and "disregard" cases, see generally Miller, "The Nominee Conundrum: The Live Dummy Is Dead, but the Dead Dummy Should Live," 34 Tax L. Rev. 213 (1979); Kronovet, "Straw Corporations: When Will They be Recognized; What Can and Should be Done," 39 J. Tax. 54 (1973).

and the corporation was endowed with certain indicia of a true agent vis-a-vis the partnership.

In *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949), the Supreme Court further considered the agency argument and set out requirements for a true corporate agent. In that case, petitioners were three wholly owned subsidiary corporations of Airco. The subsidiary corporations were employed as agents of Airco to manage and operate its plants and to sell the output thereof. The parent provided all of the necessary working capital and management expertise for its subsidiaries in return for an agreement that the subsidiary-agents would pay over to the parent all of the profits in excess of a nominal amount. Airco reported as income the profits turned over to it by its subsidiaries. The Commissioner took the position that the subsidiaries, and not Airco, were taxable on all of the profits earned, including the amounts passed to their parent corporation.

The Supreme Court held that income must be taxed to the subsidiary corporation that earns it, and anticipatory assignments of income would not be given effect. 336 U.S. at 436. While deciding that the subsidiaries were not true corporate agents, the Court did not foreclose the possibility of a true corporate agency relationship. A number of indicia were identified:

Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. * * * [336 U.S. at 437. Fn. refs ommitted.]

Applying these factors, the Supreme Court concluded that earnings of the taxpayer subsidiary corporations were turned over to Airco because Airco owned and controlled the subsidiaries. The subsidiaries had no independent relationship with Airco that would have continued if they were not owned by Airco. Therefore, a valid principal/agent relationship was not found to have been proven.

More recently, in *Strong v. Commissioner, supra,* this Court considered a situation somewhat similar to that in the instant

case and concluded that the corporation had to be treated as the owner for tax purposes. However, there we relied in our holding on the fact that the corporation should not be disregarded while leaving the door open for a consideration of the agency question. In order to comply with the usury requirements of New York law, the taxpayers had formed a corporation. Legal title was conveyed to the corporation but equitable or beneficial ownership was retained in the underlying partnership. The Court held that the purpose to avoid State usury laws is a valid business purpose within the meaning of *Moline Properties* and that the extensive activities undertaken by the corporation required "recognition of its separate ownership of the property in question and, a fortiori, of its existence as a taxable entity." 66 T.C. at 24. The Court concluded with a statement that its holding of a separate existence for the corporation—

is not based upon any failure of petitioners to turn square corners with respondent; they consistently made clear their intention to prevent separate taxation of the corporation if legally possible. They took most precautions consistent with business exigency to achieve that end. We simply hold that their goal was not attainable *in this case*. [66 T.C. at 26. Emphasis added; fn ref. omitted.]

In a footnote, the Court at first seemed to be closing the door to the agency argument by saying: "We realize that, given the economic realities, the petitioners had only a Hobson's choice—between using a corporation and foregoing the construction project for want of financing." 66 T.C. at 26 n. 12. But in the succeeding footnote, the door was left ajar with the recognition that "Whether there are limits, albeit narrow, within which taxpayers might successfully structure transactions of the type involved herein is a question we do not decide." 66 T.C. at 26 n. 13. In this case, we confront a similar situation and ask if the transaction was structured in a sufficiently narrow manner to satisfy the *National Carbide* prescription for a valid corporate agency.

The *National Carbide* test has been followed and interpreted in a number of subsequent opinions. For example, in *Carver v. United States*, 188 Ct. Cl. 202, 412 F.2d 233 (1969), the Court of Claims found a situation where, at least in part, a true corporate agency existed. In that case, Mr. Carver was the sole shareholder of a corporation that he used to hold naked title to

investments in real estate but not to possess equitable owner-
ship. The Commissioner contended that the activities of the
corporation were sufficient to find that it was a viable taxable
entity. The court, relying on the interpretation of *Moline
Properties* and *National Carbide* propounded by the Fifth
Circuit in *Tomlinson v. Miles*, 316 F.2d 710, 713–715 (5th Cir.
1963), cert. denied 375 U.S. 828 (1963), agreed with the
Commissioner that the corporation should be recognized as a
viable taxable entity.

However, in one instance the corporation was deemed to be
the trustee or agent for Mr. Carver. Mr. Carver and a third
party, Mr. Pipkin, together had purchased an 800-acre parcel
of land. Mr. Pipkin was the moving force in the transaction.
Legal title had been held by Mr. Carver's corporation, subject
to conveyance at the joint direction of Carver and Pipkin. The
court found that the corporation acted as a trustee or agent
with respect to Mr. Pipkin because he was a nonshareholder,
and such trust or agency was equally valid for Mr. Carver. 412
F.2d at 240. Therefore, despite the lack of an explicit agency
agreement, a corporate agency was found to exist because the
corporation was acting as an agent for one who was not a
shareholder.

A few years later, the Court of Claims again examined the
question of a corporation's agency status. Its reasoning is
relevant because there, as in the instant case, the corporation
was formally designated in a written agreement as the agent
of the shareholder-principal. In *Harrison Property Manage-
ment Co. v. United States, supra,* owners of oil-bearing land
formed a corporation in which they were the sole incorpora-
tors, stockholders, officers, and directors. The corporation was
formed to provide for efficient management in the event of the
death of one of the principals and to simplify routine business
procedures. Legal title to the property was transferred to the
corporation but beneficial title remained with the sole share-
holders. The corporation was found to be a viable, active
business entity. Despite the existence of a formal agency
agreement, the Court of Claims rejected the taxpayer's claim
that the corporation was a true corporate agent. In doing so, it
emphasized part of the test laid out by the Supreme Court in
*National Carbide* by stating:

*National Carbide* makes it clear the the formal designation of "agency agreement" is not conclusive; the significant criteria, as we understand them, are whether the so-called "agent" would have made the agreement if the so-called "principals" were not its owners, and conversely whether the "principals" would have undertaken the arrangement if the "agent" were not their corporate creature. * * * [201 Ct. Cl. at 85–86, 475 F.2d at 627.]

The court went on to point out that the corporation would not have entered into an "agency agreement" of the type formulated with property owners other than its own shareholders, and that the shareholders would not have transferred legal title to, or entrusted business operations to, a corporation that they did not own and control. "In other words, all of the corporation's relations with the beneficial owners of the managed property were wholly dependent on the fact that they were the sole shareholders." 201 Ct. Cl. at 87, 475 F.2d at 628.

From the analysis in *Harrison Property Management*, we know that the existence in the instant case of the agency and nominee agreements, though helpful to indicate that the investors might have intended to establish an agency relationship, is not determinative. We are obliged to scrutinize the relationship between Glenmore Manor Apartments, Inc., and the investors in the partnership to determine if the corporation acted as a true corporate agent. In the recent case of *Jones v. Commissioner*, 640 F.2d 745 (5th Cir. 1981), affg. a Memorandum Opinion of this Court, the Fifth Circuit used the six criteria enunciated by the Supreme Court in *National Carbide* to determine whether the relationship between a controlled corporate general partner and its limited partnership should be recognized for tax purposes. The court therein said that the same standards apply in evaluating whether a controlled corporation acted as a general partner vis-a-vis its limited partnership as apply to the partnership-principal/corporation-agent relationships presented in *National Carbide Corp. v. Commissioner, supra,* and *Collins v. United States*, 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975). Because we think that the situation in the instant case is similar to the factual situations in *National Carbide* and *Collins,* we think that the six *National Carbide* criteria are equally applicable here.

The first factor is whether the corporation operates in the name and for the account of the partnership. The record on

this point favors the petitioner's view that a valid agency existed. Although the purposes in the corporate charter were broadly stated, the corporation in fact never acted as anything but an agent for the investors. It was not authorized to act except pursuant to the written direction of a designated committee of the investors. Further, the corporation never represented itself as anything more than an agent of the investors. A number of the investors backed that representation by personally guaranteeing various amounts of the loans needed for the project.

In fact, it was common knowledge throughout the relevant period that Glenmore Manor Apartments, Inc., was acting for the underlying partnership. For instance, Mr. Howard E. Samuel, senior vice president of Louisiana National Bank, testified that, although the construction loan was structured through the corporation, the personal guarantees of the underlying owners were required because the bank was aware that Glenmore Manor Apartments, Inc., was a mere corporate shell. We note, further, that all of the institutions involved in financing the apartment complex, including Louisiana National Bank, Baton Rouge Bank & Trust Co., Collateral Investment Co., and First Federal Savings & Loan Association of Pittsburgh, Pa., were notified by letters from Jack N. Dyer, Jr., of the corporation's status as an agent. In the case of Louisiana National Bank and Baton Rouge Bank & Trust Co., these particular letters were sent after the loans from those banks were made; nevertheless, we have no doubt that the banks were aware of the arrangement between the borrowing corporation and the partnership. Had these two banks not known of the underlying reality until they received the letters from Dyer, they would have been justified in calling the notes and invalidating the loans upon such notification. The fact that they did not take such actions reaffirms our view that the agency relationship had been disclosed prior to the time the loans were made. In the case of the permanent financing, the commitment letter (of June 4, 1974, from First Federal) and the assignment agreement (assigning the note and mortgage from Collateral Investment Co. to First Federal) indicate to us that the two institutions involved were on notice, even before the loans were made, that Glenmore Manor Apartments, Inc., was acting as an agent for the partnership. Finally, the

electric company also apparently was aware that the partnership was the true owner of the apartment complex in that it addressed its notice of disconnection of service directly to Jack N. Dyer, Jr., rather than to the corporation or to the management company (JDA Property Management, Inc.). Consequently, we find that it was disclosed clearly to relevant third parties that the corporation operated in the name and for the account of the partnership.[9]

The second element set out by the *National Carbide* Court was whether the principal (the partnership herein) is bound by the alleged corporate-agent's actions. We believe that the evidence clearly supports petitioners' position on this point. First, as stated above, creditors and others with whom the corporation dealt were aware that the corporation was representing itself as the agent for the investors. In addition, the partners considered themselves to be bound by actions of the corporation. While the existence of a written agency agreement is not conclusive that an agency relationship existed (see discussion of *Harrison Property Management Co. v. United States, supra*), the terms thereof indicate the rights and obligations undertaken by the partners and the corporation. For instance, in the agency agreement, the partners committed themselves to indemnify and hold the corporation harmless for all acts and debts related to the apartment complex. Further, the partners agreed that they, and not the corporation, should be liable for all loans or mortgages on the Glenmore Manor Apartments property. In fact, the construction loan was guaranteed in full by Jack N. Dyer, Sr., and Jack N. Dyer, Jr., and the permanent mortgage was guaranteed in full by the same two partners and their wives. Furthermore, the $90,000 second mortgage on the property from Baton Rouge Bank & Trust Co. was endorsed and guaranteed by the Dyers in full and by seven other partners to the extent of $6,000 each. In addition, the lease agreement with Louisiana

---

[9]We are aware that in *Collins v. United States*, 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975), the District Court judge noted that the plaintiffs therein contended that "everyone who dealt with the corporation was fully aware that it was a sham and that they were dealing with the individual tenants-in-common." 386 F. Supp. at 20. However, neither that judge nor the panel of Fifth Circuit Court of Appeals judges, who affirmed the lower court's view, addressed that contention in finding that an agency relationship did not exist. 514 F.2d at 1283 n. 2; 386 F. Supp. at 21.

National Leasing Corp. was personally guaranteed by four of the partners.

The third factor is whether the corporate agent transmitted money received to the partnership. "In the normal agency relationship, a corporate agent would be expected to transmit the moneys it collects to its principal." *Jones v. Commissioner, supra* at 753. In the instant case, as in *Jones,* the ongoing construction and management of an apartment complex (especially if operated at a loss) is not the type of undertaking in which an agent would regularly transmit moneys to the principal. Therefore, while this element may have been an important part of the evaluation in the *National Carbide* situation (336 U.S. at 436), it is not applicable in the instant case.

Fourth, we consider whether receipt of income is attributable to assets or employees of the partnership. We believe that petitioners must prevail on this factor. The evidence clearly shows that no capital contributions were made to Glenmore Manor Apartments, Inc., on formation. The corporation never had any employees of its own; its only asset was record title to the apartment complex. Equitable title was in the partnership. The cash outlays needed to acquire the land and to secure financing for the project came from the original partners. Additional contributions of about $44,000 in cash were made to the partnership by the petitioners and other partners to the partnership when the project was having difficulty paying its bills. From these facts, it is fair to conclude that the apartment complex was an asset of the partnership. Legal title was transferred to the corporation in order to satisfy a requirement of the mortgagee banks. Therefore, whatever income was received by the corporation was attributable to an asset of the underlying partnership.

The fifth factor is whether the corporate agent's relationship with the partnership was dependent on the fact that it was owned and controlled by the partners. In the instant case, the agency and nominee agreements were entered into between the corporation and the original investors. The same investors owned 100 percent of the stock of the corporation from the time the corporation was formed throughout the years in issue. In fact, they each owned shares of stock in the corporation in precisely the same proportion as their original

ownership in the partnership. Glenmore Manor Apartments, Inc., clearly was controlled and dominated by the identical individuals who were investors in the partnership. The corporation was used by the partnership solely to borrow money which could not be obtained by the partners individually or by the partnership. It would be difficult to hold that the corporation and the partnership dealt with each other at arm's length. The corporation was not compensated for the services it performed, and the relationship truly was based upon the partners' ownership and control of both entities. Therefore, on this element, we think that respondent's position carries the day.

The final *National Carbide* factor to be considered in making our determination on the agency issue is whether the corporation's activities were consistent with the normal duties of an agent. On this point, the petitioners have put forth sufficient evidence to convince us that the acts of the corporation were consistent with the claims of agency. They were careful to endow the corporation with specific indicia of an agency relationship. For instance, and as we have stated, the investors represented to creditors that they, and not the corporation, were the true obligors. In addition, the corporation held only mere legal title to the property in order to satisfy the banks' requirement for financing.

We are convinced that the investors desired to operate in the partnership form and were forced to form a corporation to comply with the State's usury laws. The partners did not attempt to avail themselves of the normal benefits of the corporate form such as limited liability. Rather, the partners remained subject to the claims of creditors and to all other claims arising out of the apartment project.

We believe that the entire substance of the arrangement was one of an agency relationship, and even the form (outside of the corporation's primary liability on the mortgages) indicated the agency relationship that was intended.[10] We are

---

[10]In *Bolger v. Commissioner*, 59 T.C. 760, 766 (1973), we suggested that "the existence of an agency relationship would have been self-defeating in that it would have seriously endangered, if not prevented, the achievement of those objectives which, in large part, gave rise to the use of the corporations, namely, the avoidance of restrictions under State laws." We did not pursue that point any further. In the instant case, we have found that the corporation was formed for a valid purpose—to avoid State usury laws. The corporation was

not presented here with the use of a corporation as a tax-avoidance scheme. Rather, the partners were forced to form a corporation in order to get financing for their project. They sought none of the traditional insulating benefits of a corporate shareholder. In substance, the partners were the true economic owners of the property with all the risks and benefits attendant thereto. In such case, where the corporation was formed solely to satisfy the requirement of the bank in complying with State usury laws and the indicia of an agency relationship are present, we will respect the status of the corporation as an agent of the partnership.

Having decided that the Glenmore Manor Apartments Partnership is the proper entity to report profits and losses of the apartment complex for 1975, we now turn to the second issue: whether new partners, admitted to the partnership on December 31, 1975, may share in the partnership losses for the entire 1975 taxable year. Petitioners claim that the disproportionate allocation of losses to the new partners for the entire 1975 year should be sustained. It is respondent's position that the new partners are not entitled to deduct the portion of the partnership losses incurred prior to the time they acquired their interests in the partnership.

In a recent case, *Richardson v. Commissioner*, 76 T.C. 512 (1981), we held that, for partnership taxable years ended on or before December 31, 1975, section 706(c)(2)(B)[11] prohibited the retroactive reallocation of losses upon the admission of new partners. The petitioners therein contended that our decisions

---

primarily liable on the mortgages and to that extent can be said to be the "principal" with respect to those mortgages. But it does not follow that, in all other respects, the same corporation cannot act as an agent for a partnership.

[11]Sec. 706(c)(2)(B) provides in pertinent part:

SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(c) Closing of Partnership Year.—

\*     \*     \*     \*     \*     \*     \*

(2) Partner who retires or sells interest in partnership.—

\*     \*     \*     \*     \*     \*     \*

(B) Disposition of less than entire interest.— The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced, but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interests in the partnership during the taxable year.

in *Moore v. Commissioner*, 70 T.C. 1024 (1978), and *Marriott v. Commissioner*, 73 T.C. 1129 (1980), applied only to transfers of partnership interests between partners and not to the admission of new partners. We rejected that interpretation and held that section 706(c)(2)(B) applies to the sale or exchange of a partnership interest as well as to the reduction in an existing partner's interest solely by reason of the admission of a new partner.

We think that the reasoning expressed in *Richardson v. Commissioner*, *supra*, is equally applicable in the instant case and we find that decision controlling herein. New partners made substantial cash contributions and were admitted to the partnership on December 31, 1975, for a combined 10-percent capital interest. The interests of some of the existing partners correspondingly were reduced by 10 percent. Because the admission of new partners reduced the interests of existing partners within the meaning of section 706(c)(2)(B), we hold that the partnership may not retroactively reallocate losses to the new partners. Rather, the existing partners must report their distributive shares of partnership items in accordance with their varying interests in the partnership before and after the admission of the new partners, and the new partners may report only their shares of partnership items for the period during which they were members of the partnership.

The third issue that we must consider is how losses are to be allocated to each partner for the partnership's 1975 taxable year. Once again, our decision in *Richardson v. Commissioner*, *supra*, controls. There, we held that petitioners may use any reasonable method of allocating profits and losses for the period prior to and after the admission of new partners, including an interim closing-of-the-books method or allocation of yearend totals of income or loss ratably over the year. In the instant case, the parties have stipulated that no income was received by the partnership on December 31, 1975. They also have agreed on the amounts paid by the partnership for deductible operating expenses on December 31, 1975. There is no question that funds to pay these bills came from the capital contributions made by some of the existing partners and the newly admitted partners. Therefore, the disproportionate allocation of losses incurred on December 31, 1975, to the petitioners was reasonable, reflected economic reality, and was

not motivated by tax avoidance. For the reasons expressed in *Richardson*, we hold that petitioners may use the desired interim closing-of-the-books method to allocate losses.

Concessions having been made,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

EKMAN, *J.*, did not participate in the consideration or disposition of this case.

GOFFE, *J.*, concurring: As the author of *Jones v. Commissioner*, T.C. Memo. 1978–446, affd. 640 F.2d 745 (5th Cir. 1981), I wish to express my concurrence in the instant case not only in the result reached but also in the analysis applied by the majority. In my view, the instant case is in all material respects factually distinguishable from *Jones* and thus requires a different result than the result in *Jones*.

FAY, *J.*, dissenting: I respectfully dissent from the majority's holding that a true corporate agency for tax purposes exists in this case.

In *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437 (1949), the United States Supreme Court unequivocally stated that, for a true corporate agency to exist, the corporation's "relations with its principal *must not* be dependent upon the fact that it is owned by the principal." (Emphasis supplied.) The majority opinion, *supra* at 286–287, finds as a fact that the relations between the corporation and the partnership involved herein were dependent on the fact that the corporation was owned and controlled by the partners. In my view, that finding alone mandates a decision for respondent in this case.

The majority opinion treats the dependency of the corporation-partnership relations on the partners' ownership and control of the corporation as being merely one of six relevant factors. Such treatment does not comport with a fair reading of *National Carbide Corp. v. Commissioner, supra*. In *National*

*Carbide*, the United States Supreme Court listed four consider-ations which are relevant in determining corporate agency. Those four considerations are designated as factors one through four in the majority opinion, *supra* at 284–287. After its listing of relevant considerations, the Court in *National Carbide* added two absolutes:

If a corporation is a true agent, its relations with its principal *must not* be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose *must* be the carrying on of the normal duties of an agent. [336 U.S. at 437; emphasis added.]

Treating those absolutes as mere "factors" simply ignores the language of *National Carbide*. Indeed, the Fifth Circuit Court of Appeals, to which an appeal herein would lie, has clearly distinguished between *National Carbide's* "relevant consider-ations" and its "absolutes" by designating the latter as "crucial factors." *Jones v. Commissioner*, 640 F.2d 745, 755 (5th Cir. 1981).[1]

Given the rule of *National Carbide* and the majority opinion's finding of fact concerning the dependent relations between the corporation and the partnership, I would hold that, for tax purposes, the corporation was not a mere agent of the partnership.

IRWIN, WILBUR, and CHABOT, *JJ.*, agree with this dissenting opinion.

NIMS, *J.*, dissenting: While I sympathize to some extent with the majority's efforts to rescue these petitioners from a quandary not entirely of their own making, but rather one created by the concept of usury rendered archaic by the cold reality of contemporary economics, nevertheless I find it inappropriate to here sanction an end-run around *Moline Properties* and its holding that so long as the purpose of incorporation is the equivalent of business activity, or is followed by the carrying on of business by the corporation, the

---

[1]See also *Harrison Property Management Co. v. United States*, 201 Ct. Cl. 77, 475 F.2d 623 (1973), cert. denied 414 U.S. 1130 (1974), wherein the Court of Claims treated the dependency of the corporate-"principal" relations on the ownership of the corporation as the deciding factor in rejecting a corporate agency argument.

corporation remains a separate taxable entity. *Moline Properties v. Commissioner*, 319 U.S. 436 (1943). The Courts have been confronted with just such an effort by the Commissioner in the one-person corporation arena, for example, where the Commissioner purports to recognize the legitimacy of the corporation but then proceeds to vitiate its effectiveness as a separate taxable entity by seeking to reallocate all of its income to the sole shareholder under the anticipatory assignment of income doctrine. See *Rubin v. Commissioner*, 429 F.2d 650 (2d Cir. 1970), revg. 51 T.C. 251 (1968). It may well be that, as posited by Emerson,[1] a foolish consistency is the hobgoblin of little minds, but here consistency is not foolish and judicial even-handedness requires it.

It seems indisputable, in the case before us, that to avoid the Louisiana usury law there had to be some substance to the corporation's activities beyond the mere functioning as nominee or agent for the actual owners.[2] In this case, the corporation's activities went far beyond the mere holding of title: as the findings of fact indicate, the corporation took title to the property, executed a mortgage note for a construction loan, contracted for the construction of the property, and executed a note and mortgage for the permanent financing.

True, the corporation and the partnership entered into various side agreements purporting to spell out the relationship (nominee and later agent) of the corporation with the partners, and the officers of the various lenders acquiesced, if they did not actually participate, in the usury-avoidance charade, but the corporation was held out to the world by recordation of title and mortgage documents, at least, as a viable independent corporate entity. To have publicly revealed an agency or nominee status would have completely destroyed the usury-law-avoidance strategem.

In short, I would hold that these taxpayers cannot have it both ways: either the corporation must be recognized as a viable entity engaged in business, with all the tax benefits and burdens attendant thereupon, or its relationship with the

---

[1]Ralph Waldo Emerson, Essays, First Series (1841).

[2]For example, financial institutions typically use street name nominees for convenience in holding registered securities, but the true ownership of the securities remains unquestioned. That is not our case.

partnership must be exposed as a transparent artifice, i.e., a sham, designed solely to thwart the law of Louisiana, an effort upon which this Court should seriously reflect before lending its support.

As the Supreme Court observed at the conclusion of *Moline Properties*, "the question of agency or not depends upon the same legal issues as does the question of identity previously discussed." I think the activities of the corporation in this case mandate the conclusion that it is to be dealt with as a separate, viable entity, and that the question of agency thereby becomes subsumed.

Furthermore, there is no real substantive distinction between this case and *Strong v. Commissioner*, 66 T.C. 12 (1976) (Reviewed by the Court). If *Strong* was wrongly decided, then, at least, we should say·so.

FAY, HALL, and CHABOT, *JJ.*, agree with this dissenting opinion.